**RELIANT ENERGY SERVICES, INC., Appellant,**

v.

**COTTON VALLEY COMPRESSION, L.L.C., Appellee.**

**and**

**Cotton Valley Compression, L.L.C., Appellant,**

v.

**Reliant Energy Services, Inc., Appellee.**

**No. 01–08–00148–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

Feb. 10, 2011.

John V. Anaipakos, Baker Botts, L.L.P., Houston, TX, for Appellant.

Julian J. Fertitta III, Grimes & Fertitta, P.C., Houston, TX, for Appellee.

Panel consists of Justices KEYES, ALCALA, and SHARP.

## OPINION

JIM SHARP, Justice.

Cotton Valley Compression, L.L.C. ("Cotton Valley") brought a breach-of-contract action against Reliant Energy Services, Inc. ("Reliant") based on theories of actual and apparent agency by a third-party, Westfield Oil & Gas, Inc. ("Westfield").[1] The jury found in favor of Cotton Valley on both theories of agency and rejected Reliant's affirmative defense of quasi-estoppel. Thereafter, the trial court rendered judgment against Reliant on the jury verdict under the theory of apparent authority but granted Reliant's motion for judgment notwithstanding the verdict on the theory of actual authority.

Both parties appealed—Reliant on issues of apparent authority and its affirmative defense of quasi-estoppel; Cotton Valley on the trial court's judgment notwithstanding the verdict on an issue of actual authority. We determine whether (1) there was legally- and factually-sufficient evidence to support the issue of apparent authority, (2) whether there was legally-sufficient evidence to support the jury's verdict on the issue of actual authority and whether the subsequent judgment notwithstanding the verdict should be reversed, (3) whether Reliant proved its affirmative defense of quasi-estoppel as a matter of law, (4) whether Reliant preserved complaints regarding the admission of certain evidence, and (5) whether the trial court erred in not granting Reliant a new trial in the interest of justice.

We affirm.

## Background

### A. Westfield and Reliant

Ernie Gouge founded and was sole owner and president of the Houston-based Westfield Oil and Gas[2], a small natural gas-trading company comprised of no more than three employees, occasional contract workers, and several associates who helped bring in business. From 1998 to 2001, Westfield had no gas-storage facilities, no pipeline, no transportation contract with any pipeline,[3] and no one acting as a scheduler in dealing with a pipeline.[4]

1. Westfield Oil & Gas, Inc. and Ernie Gouge, d/b/a Westfield Oil & Gas were originally parties to the suit, as were several other plaintiffs; however, none is a party to the judgment at issue and none is a party to this appeal.

2. The company is also known as Westfield Oil and Gas, Inc.

3. Pipelines charge a fee for transporting gas on a pipeline, similar to a motorist paying a toll for accessing a toll road, based on the amount of capacity sought. Only companies affiliated with the pipeline are permitted to transport on the pipeline.

4. The pipeline's data system allowed access to producers who purchased a "receipt point." The system functioned as a communication center between buyers and sellers, allowing parties to close deals by way of the nomination process. A scheduler for a producer would submit a nomination to the pipeline's data system, entering the amount of volume of gas that the seller was putting into the pipeline. Nominations had to be in the system on the last day of the month prior to the

Gouge and his associates had a talent for identifying production fields, establishing relationships with gas producers, and aggregating significant volumes of gas. In the mid–1990s, his company began aggregating or pooling gas from several producers specifically for delivery to Reliant. Reliant relied upon gas-trading companies like Westfield for acquisitions from small independent producers in certain regions.

In 1995, Westfield signed a base contract with Reliant [5] to supply natural gas to Reliant. Westfield and Reliant additionally had a number of unwritten agreements relating to their arrangement, including:

—one permitting Westfield to utilize Reliant's accounting and scheduling staff and to rely on Reliant's transportation contracts with pipelines rather than purchasing its own;

—that Reliant would pay Westfield earlier than the contract required ("prepays") for gas that had already been received; [6]

—a "gentleman's agreement" that Reliant would take all the gas that Westfield could aggregate and Westfield would sell to no one else; and

—agreements that Westfield could "play the gas" (receive a profit based on the daily price of gas) when Reliant had directly contracted for gas with certain producers [7] brought to Reliant by Westfield acting as its agent.

month in which the gas was to be sold. The nomination was then matched up with the entity receiving the gas on the other end. A buyer could "pick up" the gas purchased by making a nomination through its own scheduler into the pipeline data system of the volume of gas to be retrieved from the system. The act of inputting the nomination was the only way the pipeline system could determine to whom the gas belonged.

5. Under its predecessor name of NorAm.

Because Westfield and Reliant often made verbal agreements, the written contract between them did not fully explain their relationship. Further, Westfield—with Reliant's knowledge—routinely used Reliant's name as Westfield's "calling card" to find producers, a practice Reliant later directed Westfield to stop.[8] The Reliant name provided Westfield credibility with the producers. Although it was unusual for an independent gas marketer to disclose the name of its buyer to the producer and risk that producer selling directly to the buyer, Gouge was unconcerned about disclosing Reliant's status as the buyer because of his long association with Reliant and the "gentleman's agreement" between them. Once Westfield had arranged for delivery of the gas, it was not involved in the actual transfer of the gas from the producer to Reliant. Reliant worked directly with the producers in executing the transactions required by the transporting pipeline for the transfer of title to the gas, known as nominations. Under this method, as far as the pipeline data system was concerned, physical possession of the gas passed directly from the producers to Reliant; Westfield never physically possessed it.

## B. The "Deal" for Cotton Valley's Gas

### 1. The Initial Contacts and Discussions

6. Reliant would charge Westfield interest on these early pays because of the time value of money. Reliant also made early-pay accommodations to other companies.

7. Reliant made such direct contracts with three companies—Crosstex, Cinergy, and Tri–Union.

8. It is unclear when Reliant told Westfield to stop using its name, but the record suggests that it was sometime after the Cotton Valley deal had been made.

In early 1999, Westfield sought to expand into Oklahoma. In March, Gouge wrote a letter to his then-contact at Reliant, Pat Strange, expressing his desire to acquire gas from certain Oklahoma producers, including Cotton Valley, and asked for Reliant's assistance.

Cotton Valley was a cooperative comprised of several local northeastern Oklahoma independent natural-gas producers that joined together to build a gas-compression station [9] and to market and sell the cooperative's gas. In 1999, it had two employees—John Eakin, the general manager, and Pam Brown, the assistant manager—and its office was located in Bartlesville, Oklahoma. Brown handled all the day-to-day operations, including selling the gas and inputting nominations into the system.

Prior to the sending of the March 1999 purchase agreement, one of Gouge's associates, Ben Campbell, called Brown at Cotton Valley and told her that Westfield was seeking natural gas in the Oklahoma/Texas area "for [Reliant]." Cotton Valley was later contacted by Gouge, who told Eakin and Brown that he was gathering gas for Reliant and could offer Cotton Valley a "bonus" or premium over the market price. He explained that Reliant would take possession of the gas at Cotton Valley's receipt points [10] by accepting nominations at that point. Once the gas passed through the meter, was measured, and got into the pipeline system, it was Reliant's gas. Reliant would pay the pipeline's charges to transport the gas to the Cotton Valley compression station, and then pay the pipeline's charges to transport the gas to the market zone.[11] Cotton Valley would confer directly with Reliant's scheduling department to give them Cotton Valley's nominations; Reliant would then put the nominations into the database system to pick up the gas and would place money to pay for the gas directly into an escrow account which had been set up at Bank One by Westfield. The purpose of the escrow account was to ensure that the producers were paid before Gouge took any excess money out of the account. Gouge told Cotton Valley that (1) Westfield was gathering gas for Reliant, (2) Westfield and Reliant had "some kind of relationship," (3) Westfield could pay a bonus or premium over the market for the gas because of that relationship, (4) Cotton Valley would be delivering the gas directly to Reliant, (5) Westfield could set up an escrow account where cash would come directly from Reliant, and (6) Cotton Valley would be paid by the 25th of each month, every month. Cotton Valley believed that it was going to be in business with both Westfield and Reliant, with Westfield operating as the "gas aggregator" or "middleman" for Reliant, but Westfield itself never receiving title to the gas. It was significant to Cotton Valley that Reliant was getting the gas because Reliant was a major company, so Cotton Valley did not anticipate having credit issues in the transaction. Eakin called a refer-

9. Producers transported their gas to market via pipelines. The pipeline in the area of Cotton Valley was the Williams pipeline which had several different pipelines to handle different amounts of pressure, and it was necessary to compress the gas coming from the fields of various producers in order to get it into the small-pressure pipeline that traveled to where the marketers preferred to buy, which was called the market zone.

10. The point at which gas entered the pipeline from a production field was called a receipt point (also known as a wellhead). The pipeline would sell "taps," which were meters to measure the gas going out of a field and into the pipeline at receipt points. The area where the gas entered the pipeline at receipt points was called the production zone.

11. Westfield had no transportation capacity on the Williams pipeline.

ence for Westfield, John Alden at Swift Energy, who spoke well of Westfield. Neither Eakin nor Brown contacted anyone at Reliant before Cotton Valley agreed to the deal with Westfield, nor did they request Westfield's financial statements. Apart from the fact that there was one, Cotton Valley did not know any particulars of the relationship between Westfield and Reliant and never sought clarification on this point from Reliant.

## 2. The March 31, 1999 Purchase Agreement

Cotton Valley signed a purchase agreement with Westfield on March 31, 1999 for the sale of gas from April 1 through April 30, 1999, with Cotton Valley listed as seller and Westfield as the buyer. Gouge signed for Westfield and Eakin signed for Cotton Valley. The agreement made no specific reference to Reliant, but Cotton Valley believed Reliant was involved because Reliant was taking possession of the gas at the pick-up points and making payment through the escrow account. The agreement recited that "Westfield's purchaser" would "pay direct" to the escrow account.

According to Gouge, the agreement was intended to be an "evergreen" contract, automatically renewing each month unless one party cancelled by giving 30 days notice, but the March 31, 1999 purchase agreement contained no such language. There was no other written contract between Westfield and Cotton Valley and none for the July 2001 gas at issue. There was no written or verbal agreement between Cotton Valley and Reliant, and Reliant never made any representations to Cotton Valley, either verbally or in writing, that suggested that Westfield was acting on Reliant's behalf. Nevertheless, Cotton Valley felt that Reliant's actions over the period of the arrangement confirmed that Westfield and Reliant were working together to acquire Cotton Valley's gas for Reliant.

## 3. The Day-to-Day Operations of the Arrangement

### a. Communications and Points of Contact

In selling gas, Cotton Valley would establish a gas-trader relationship, reaching an agreement with the gas trader as to price, volume, and location for "pick up." This person was the one with whom the sale was made and was the first major contact between a buyer and Cotton Valley. In the transactions regarding the sale of natural gas at issue, Cotton Valley dealt with Westfield as the gas trader. Cotton Valley's second point of contact was with a scheduler; without a scheduler, an entity could not purchase Cotton Valley's gas. In this case, Cotton Valley always dealt directly with Reliant's schedulers, usually Lee Ann Brubaker. The final point of contact was with the accounting department in order to send the invoice and to collaborate regarding payment; Cotton Valley dealt with both Westfield's and Reliant's accounting departments, calling Reliant's accounting department occasionally to make inquiries about payment when payments were not timely made.

### b. Transfer of Gas

The actual transfer of gas took place through the process of nominations to the Williams pipeline. According to Gouge, each month Brown would fax Gouge a sheet showing the volumes that Cotton Valley would have available and Gouge would use those totals to make a verbal nomination to David Dunnavant [12] at Reli-

---

12. David Dunnavant worked for Reliant during the period from 1999 through August 2001. Among his responsibilities was assembling a supply of natural gas for Reliant to

ant, who would then pass it on to his gas-control people. Verbal nominations were later followed up with hard copies of the nominations.

Cotton Valley sent its actual nominations to Brubaker at Reliant. The nominations included information which Reliant needed to be able to pick up the gas. Originally, the nominations to Brubaker included the price information for the contract price of the gas as paid to Cotton Valley by Westfield. This information was later deleted from the original nominations sent to Brubaker after Brown learned that Reliant paid a different price for the gas.

Cotton Valley made its first nomination to Reliant on the same day that the sole purchase agreement was signed between Cotton Valley and Westfield, March 31, 1999. Brown faxed the nomination to Brubaker, Reliant's scheduler, providing the amount of mmBtus [13] per day that Cotton Valley was going to be putting into the pipeline and where they could be received, so that Reliant could then submit a nomination into the Williams pipeline database to "pick up" the listed mmBtus at the receipt points. Reliant "picked up" the gas for April and deposited the money for the gas in the escrow account in May. This process was repeated for the rest of the time that Cotton Valley delivered gas to Reliant. Because the gas was actually "picked up" by Reliant, the monthly pipeline allocation documents ("the Quapaw receipts") issued by the Williams pipeline that indicated the volumes of gas nominated versus the amount of gas that actually flowed into the pipeline at the Cotton Valley's receipt point showed that Reliant picked up the gas from Cotton Valley, not Westfield.

In the beginning of the arrangement, Cotton Valley only sent the nominations to Reliant, but later Gouge requested that a copy be sent to him at Westfield because he wanted to be kept "in the loop." The copy sent to Gouge was only a carbon copy and did not mean that Westfield could pick up the gas. The system did not permit two different nominations for the same gas to two different people, and Westfield had no ability to pick up the gas because it had no relationship with the pipeline and no scheduler.

### c. Billing and Payment

Before the nominations were sent, Brown would negotiate with Gouge regarding the price and volume of gas to be sold. Westfield and Cotton Valley would agree on a standard price based on a monthly price known as an "Inside FERC" [14] basis, along with an additional premium, a small additional amount, such as a penny, except when additional production was brought on the line, which production was priced at a "Gas Daily" [15] price. Any discussions about price took place between Westfield and Cotton Valley prior to the gas actually flowing and the nominations being sent.

Cotton Valley would wait for the pipeline to "balance the system" [16] within eight

---

trade and, along with Pat Strange, Dunnavant dealt with Westfield regarding the Cotton Valley gas.

**13.** An mmBtu is a measurement for natural gas, a unit of energy equal to a thousand cubic feet of natural gas with a heating content of a thousand Btus (British thermal units).

**14.** *Inside FERC* is the name of a publication whose fixed monthly pricing of gas is the standard for the industry. "FERC" is an abbreviation for the Federal Energy Regulatory Commission.

**15.** *Gas Daily* is another industry publication.

**16.** When a producer makes a nomination, the nomination is only a projection of the amount

days and then invoice Westfield. On the 25th day of the following month, it would get paid for the previous month's gas. Cotton Valley had been asked not to send invoices to Reliant directly because of the arrangement that Westfield had with Reliant, but instead to send them to Westfield, which it did. Cotton Valley never invoiced Reliant. The invoice often, but not always, included a signature-confirmation line for Gouge to authorize a pay-out to Cotton Valley via wire transfer for the invoiced amount from Westfield's escrow account. On four occasions, Westfield wired a portion of the payment owed to Cotton Valley from a separate Wells Fargo account owned by Westfield, rather than the Bank One escrow account. The Bank One escrow account was not specifically set up for Cotton Valley, but had existed for a number of years, and had been set up for Swift Energy. Cotton Valley knew that Swift Energy was also being paid from the account, but did not know the exact arrangement or what priority Swift had on the account, though Cotton Valley presumed that Swift Energy would be paid first because it had the arrangement first.

The amount paid by Reliant for the gas was not the same price paid by Westfield to Cotton Valley for the gas. Cotton Valley was not aware of the price that Reliant paid for the gas and never asked Reliant to pay Cotton Valley directly prior to July 2001. The price that Cotton Valley received for the gas was usually a fixed price of "Inside FERC" plus a premium. The price that Reliant paid for the gas was based on a variable or daily price—sometimes higher than Cotton Valley's price and sometimes lower.[17] Each month,

Gouge would propose a price to Reliant for the gas that would flow to Reliant the following month. Reliant and Westfield then would negotiate and come to an agreement on the price and Westfield would invoice Reliant after the gas had been received by Reliant. When Reliant's price was not higher than Cotton Valley's, Westfield made no money on the gas. Generally, when the market dropped, a broker could take the gas and sell it to the highest bidder, but Westfield could not do so because of its "gentleman's agreement" with Reliant. When Westfield lost money, it would use cash reserves; if it had none, Reliant would advance money to Westfield for gas already received, but whose payment was not yet due, in what was known as an "early pay."

## C. Issues with Payments and Gas Transfers from May 1999 through July 2001

### 1. The May 1999 "Refund" Check to Reliant

In May 1999, Brown sent two invoices to Westfield for gas delivered to Reliant, one for a larger amount and one for a smaller amount, for two separate volumes of gas that flowed in the same month. Cotton Valley was paid on both invoices. Brown later mistakenly thought that Cotton Valley had been overpaid and, seeking to refund the "overpayment," sent a letter to Reliant along with a check refunding the smaller amount to Reliant directly. When Cotton Valley later realized that there had been no overpayment, a stop-payment order was placed on the check. Brown informed Brubaker of the confusion about

of gas that is expected to flow into the pipeline; the actual amount may vary due to numerous conditions. If the actual amount of gas that flows into the system from the producer is less than the nomination made, an imbalance is created. If the buyer of the

gas enters a nomination to pick up more or less gas than the seller actually places into the system, this also creates an imbalance.

**17.** Reliant was always invoiced by Westfield, never Cotton Valley.

overpayment and the stop-payment order on the check. Brubaker thanked Brown for the information, but did not ask Brown why Cotton Valley had sent Reliant the check nor indicate that the money should have gone to Westfield.

### 2. The February 2000 Proposed Escrow Agreement and the December 2000 Addendum to the Trust Agreement

In February 2000, Cotton Valley asked Westfield to sign an escrow agreement that would ensure that Cotton Valley would be paid from the escrow account before Gouge took any funds from the account. Robert Kane,[18] one of the owner-producers of Cotton Valley and a practicing lawyer, reviewed the draft escrow agreement before it was sent to Gouge. The draft agreement—which defined Cotton Valley as the seller, Westfield as the buyer, and Bank One as the agent—stated that on February 1, 2000,[19] Cotton Valley and Westfield had entered into a gas purchase and sales agreement under which Cotton Valley agreed to sell and deliver gas to Westfield, Westfield agreed to sell and deliver gas to Reliant, and Reliant agreed to purchase gas from Westfield. Reliant was not listed as a party to the draft agreement, but was defined in the document as Westfield's "resale customer." The agreement also stated that Cotton Valley and Westfield had asked Bank One to receive payment from "the Resale Customer" (Reliant) for gas purchased by Reliant from Westfield, and provided that Bank One would disburse those funds as provided by the agreement. The document was already signed by Eakin on behalf of Cotton Valley when it was sent to Gouge for his signature and for a signature by a representative of Bank One, but the document was never executed.

Eakin was anxious to get the addendum signed by Gouge, and Brown continued to contact Gouge about signing the addendum for several months. Finally, in October 2000, Brown sent a fax to Gouge informing him that Eakin had told her to "only sell half our gas production to you for the month of November 2000, or until we can get a signed contract with you and a bank." In November, Cotton Valley sold some of its production to another company in an effort to put pressure on Gouge to sign. In December 2000, Gouge signed an addendum to the trust account that provided that direct disbursements would be made to Cotton Valley and that no money would be paid to Westfield until after such disbursements were complete. Bank One and Cotton Valley were also parties to the addendum, but Reliant was not.

### 3. Problems in Communications with, and Payment by, Westfield

In May 2001, Eakin sent Gouge a letter complaining that Gouge had not been returning Brown's phone calls and had not executed signature confirmation of volumes and dollar amounts and that such communication problems made Eakin uncomfortable and was unacceptable, particularly given the large amounts of money involved. The letter specifically complained about a late payment in February 2001.

Not addressed in the letter was a separate problem that Cotton Valley had with timely payments by Westfield. On occasion, Cotton Valley's payments were held up because of pricing issues that Westfield had with Reliant. When that occurred, Brown would call Gouge. If she could not reach him, she would call the accounting

---

**18.** Kane later became manager of Cotton Valley after Eakin was discharged.

**19.** There was no written gas purchase and sales agreement entered into between Cotton Valley and Westfield on February 1, 2000.

department, and if the delay was more serious, she would call Bank One. Reliant would also take Brown's calls if she had a question about accounting.

### 4. The Gas Balance Transfers Between Cotton Valley and Reliant, and Reliant's Unannounced Transfer of Cotton Valley's Gas in August 1999

Because nominations entered by producers are actually only estimates of projected gas flow, the nominations of gas entered by Cotton Valley for Reliant often turned out to be lower or higher than the amount of gas that actually flowed into the pipeline, and for which Reliant had entered nominations, leaving Reliant with either more or less gas than purchased. These imbalances were handled between Cotton Valley and Reliant by way of imbalance transfers between the two companies.[20] Imbalance transfers were effectuated by filling out a form from the pipeline system to transfer volumes from one party to another so that the pipeline could track and allocate the proper volumes to the proper parties.

Cotton Valley tracked the imbalances between Reliant and itself and the two companies made numerous agreements for imbalance transfers of gas between themselves as needed. Westfield played no role in these transactions and none of the imbalances was ever credited to Westfield. Westfield had no relationship with the pipeline, nor did it have an operating-balance agreement with the pipeline to track what was owed to or from a company, which was required to conduct balance transfers. Cotton Valley did send an explanation once to Westfield when the transactions between Cotton Valley and Reliant affected invoicing to Westfield.

In August 1999, without the knowledge or agreement of Cotton Valley, Reliant did not make a nomination for Cotton Valley's gas for August 1, 1999, even though the gas had flowed from Cotton Valley to Reliant that day. By doing so, Reliant effectively made up "on its own" for an imbalance of Cotton Valley's gas that Reliant was due, without the customary procedures, without notifying the pipeline, and without any notice to Cotton Valley. Reliant "just essentially took [Cotton Valley's] gas without telling [Cotton Valley] about it." Brown discovered this when she received the allocation sheets from the pipeline in September. She sent a fax to Gouge, explaining the situation and protesting Reliant's action. Brown stated that she was "fine" with Reliant making up the imbalance but wanted to know "up front" what was going on and what Reliant wanted to do or Cotton Valley "would stop doing business with them."

### D. The July 2001 Gas Transfers and August 2001 Billing

In June 2001, Brown sent a nomination to Brubaker at Reliant for the expected July 2001 production, following the usual procedures. On July 25, 2001, Brown sent a fax to Brubaker, advising Brubaker that she wanted to do a nomination change to increase the amount of gas to be delivered because Cotton Valley had a new producer and so more gas was available. Brown actually dealt with Gary Groft, another scheduler for Reliant, and suggested an additional volume of gas to be sold at the "Gas Daily" price. Reliant agreed to accept the additional gas. Brown did not ask Westfield if it wanted to purchase the gas because Reliant was the company who was actually picking up Cotton Valley's gas. Brown did not inform Westfield

---

**20.** Imbalances between buyers and sellers could also be "cashed out," meaning the seller could pay the buyer the offset, but Cotton Valley preferred to do imbalance transfers.

about the additional gas, and no one at Reliant told Brown that she needed to talk to Westfield; Reliant simply agreed to accept the additional gas at the proposed price. Reliant received physical possession of the gas and later either Reliant traded it or its affiliates burned it and sold it as electricity.

In August 2001, Cotton Valley sent an invoice to Westfield for the July gas, including the extra gas brought online in the last five days of the month, for a total amount due of $1,080,584.25. The extra gas was about $68,000 of the total due. Gouge sent back the invoice with a confirming signature authorizing payment. The 25th of the month fell on a weekend and so Cotton Valley was not expecting to get paid until the following Monday. When no money arrived on the following Monday, Brown tried to reach Gouge, but he did not return her calls. She did reach Campbell, who told her that he thought there was a pricing issue between Gouge and Reliant. Since such situations had arisen before, Brown did not become alarmed, although she was still concerned about the payment because Cotton Valley had expenses that it needed to pay and payments that it needed to make to the producers based on the producers' shares in the co-op. The producers themselves needed the payments to pay production taxes and royalty fees.

When Brown had not heard from Westfield by August 29, she called Dunnavant at Reliant to ask about the money that was due and the pricing issue mentioned to her by Campbell. Cotton Valley had been given Dunnavant's name as a contact by Gouge, but Brown had never spoken to him before. Dunnavant told her that he was not aware of any pricing issues, he was not involved in trading anymore and did not talk to Gouge about trading, but he would look into the matter and see what he

could find out. Dunnavant also told Brown that he was not aware of any reason that Reliant would not have sent Gouge his money. Brown told Dunnavant that "he owes us a million and 80 thousand" and that the "guys" were getting "really uneasy." The following day, August 30, not having heard back from Dunnavant, she called him again, this time in the presence of Eakin. Dunnavant told her that he thought that there was a pricing issue, but that the money had been placed in the escrow account on August 27 and he did not know why Cotton Valley had not been paid. Late in the afternoon that day, Cotton Valley received a fax from Westfield explaining that there had been a pricing issue between Westfield and Reliant and that Cotton Valley would not be paid for the July 2001 gas. Cotton Valley was never paid for the gas by either Westfield or Reliant.

## E. Testimony at Trial from Gouge and Reliant Regarding Westfield's Status as an Agent for Reliant Relative to the Cotton Valley Deal

Cotton Valley subsequently filed the underlying suit in this appeal against Gouge, Westfield, and Reliant, seeking payment for the July 2001 gas under various legal theories. By the time the case went to trial, only Reliant remained as a defendant, and the only legal theories submitted to the jury were that Reliant was responsible to pay for the July 2001 gas because of either actual or apparent agency on the part of Westfield and that Cotton Valley was estopped from seeking a payment from Reliant for the July 2001 gas.

At trial, the following testimony was given by Westfield and Reliant regarding Westfield's role in the Cotton Valley deal and whether Westfield had actual authority to act as Reliant's agent for the purchase of natural gas from Cotton Valley.

### 1. The Testimony of Gouge

Gouge testified that "had [Westfield] contracted Cotton Valley's gas directly with [Reliant], [he] undoubtedly would have negotiated terms and price on behalf of [Reliant] to do that; but [Westfield] didn't. [Cotton Valley] did contract with [Westfield]; and [Westfield] in turn, contracted with [Reliant].[21] So, the terms and conditions that [Gouge] negotiated with Cotton Valley were done to the benefit of Westfield." Gouge agreed that he did not have to check with Reliant before aggregating the gas because Reliant had agreed to take all he could aggregate and agreed that "as a result, [he] had the authority from [Reliant] to go out and get this gas; [he would] negotiate a price and terms for gas that was to be delivered to [Reliant]; [t]hat was the deal[.]" Gouge testified that Cotton Valley sold its gas to Westfield and Westfield then sold the gas to Reliant and reiterated that he had been buying Cotton Valley's gas on behalf of Westfield. Gouge also acknowledged that Westfield owed Cotton Valley the disputed amount for the July 2001 gas, but stated that he felt "that Reliant is also responsible."

### 2. The Testimony of Dunnavant

Dunnavant understood the relationship between Westfield and Reliant, as far as the Cotton Valley gas was concerned, to be one in which Westfield was selling gas to Reliant. Dunnavant said that he was not aware that Gouge had used Reliant's name when Gouge approached Cotton Valley, that he had not discussed Cotton Valley with Gouge before Gouge approached it, and that he first heard of Cotton Valley after Gouge had secured an agreement with Cotton Valley for gas. According to Dunnavant, Westfield had not been author-ized by Reliant to buy Cotton Valley's gas for Reliant's account. Dunnavant also stated that the fact that Reliant was receiving the nominations from Cotton Valley did not mean that it was buying the gas from Cotton Valley; Reliant's scheduler was involved in the process because the nominations received from Westfield only had volumes, but Reliant needed additional information, such as meter numbers, for the physical-nomination process so that the gas could actually flow to Reliant.

### 3. The Jury's Verdict

At trial, the jury was asked to answer the following questions, and it gave the following answers:

### QUESTION NO. 1

Did Reliant and Cotton Valley agree that Reliant would pay Cotton Valley for its 2001 gas production?

*Definitions and Instructions*

A party's conduct includes the conduct of another who acts with the party's authority or apparent authority.

"Authority" for Westfield to act for Reliant must arise from Reliant's agreement that Westfield act on behalf and for the benefit of Reliant in purchasing gas from Cotton Valley.

"Apparent authority" exists if Reliant:

(1) knowingly permitted Westfield to hold itself out to Cotton Valley as having authority to act on Reliant's behalf in purchasing gas from Cotton Valley, or

(2) through lack of ordinary care, bestowed on Westfield such indications of authority that would lead a reason-

---

**21.** Reliant kept track of gas purchases through a computer system that gave each deal a specific number and tracked physical trades and financial transactions. In regard to Cotton Valley's gas, Westfield was shown as the other party to Reliant's deal, not Cotton Valley, in contrast to deals where Reliant had contracted directly with purchasers.

ably prudent person to rely on the apparent existence of authority to his detriment.

Only the acts or omissions of Reliant may be considered in determining whether apparent authority exists. Apparent authority may only be based on facts known to, and relied upon by, Cotton Valley.

(1) Answer "Yes" or "No" as to authority: Yes

(2) Answer "Yes" or "No" as to apparent authority: *Yes*

If you answered "Yes" to any part of Question No. 1, then answer the following question. Otherwise do not answer the following question.

### QUESTION NO. 2

Is Cotton Valley estopped from seeking payment from Reliant for its July 2001 gas production?

*Definitions and Instructions*

"Estoppel" precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken.

Answer "Yes" or "No" *No*

The jury was not asked to determine the amount of damages. Before the jury verdict, the parties stipulated that Cotton Valley had not been paid for the July 2001 gas production and that the amount in controversy was $1,067,322.19. The parties also subsequently stipulated as to attorney's fees.

**4. The Judgment Notwithstanding the Verdict, the Rendition of Judgment, and the Motion for New Trial**

After the jury verdict, Reliant filed a motion for judgment notwithstanding the verdict, challenging all three of the jury's findings. After reviewing briefing from both parties, and conducting a hearing on the motion, the trial court granted the motion as to the actual-authority finding and denied it as to the jury's findings on apparent authority and estoppel.

The trial court subsequently rendered a judgment in Cotton Valley's favor for $1,067,322.20 in damages, along with pre- and postjudgment interest and attorney's fees.

Reliant filed a motion for new trial asserting that (1) there was factually-insufficient evidence to support the jury's finding on actual authority, (2) there was factually-insufficient evidence to support the jury's finding on estoppel, (3) the admission of certain evidence was erroneous and likely caused the rendition of an improper verdict, and (4) a new trial should be granted in the interest of justice. The trial court denied Reliant's motion for new trial.

### Sufficiency Contentions on Appeal

Three sufficiency issues are presented in this appeal. In its first issue, Reliant challenges the legal and factual sufficiency of the jury's finding of apparent authority. In its second issue, Reliant argues that it proved its affirmative defense of quasi-estoppel "as a matter of law," raising a legal-sufficiency challenge to the jury's adverse finding; elsewhere in its brief, Reliant also raises a factual-sufficiency challenge to this adverse finding. Finally, in its sole issue, Cotton Valley challenges the trial court's judgment notwithstanding the verdict on the issue of actual authority, an issue which we review under legal-sufficiency standards. *See Wal–Mart Stores, Inc. v. Miller,* 102 S.W.3d 706, 709 (Tex. 2003).

**A. Sufficiency Standards of Review**

**1. Legal-sufficiency standard**

In reviewing the legal sufficiency of the evidence, we must consider the evidence in the light most favorable to the fact-finder's decision and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex.2005). "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review.... [L]egal-sufficiency review in the proper light must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Id.* at 827. The jury is the sole judge of witnesses' credibility, and it may choose to believe one witness over another; a reviewing court may not impose its own opinion to the contrary. *Id.* at 819. Because it is the jury's province to resolve conflicting evidence, we must assume that jurors resolved all conflicts in accordance with their verdict if reasonable human beings could do so. *Id.*

When a party attacks the legal sufficiency of an adverse finding on an issue for which it did not have the burden of proof, it must demonstrate that there is no evidence to support the adverse finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex.1983). Such a no-evidence challenge will be sustained when " '(a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact.' " *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex.2003) (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex.2004) (quoting *Havner*, 953 S.W.2d at 711). However, evidence does not exceed a scintilla if it is so weak as to do no more than to create a mere surmise or suspicion that the fact exists. *Ford Motor Co.*, 135 S.W.3d at 601 (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983)).

When a party attacks the legal sufficiency of an adverse finding on an issue on which it has the burden of proof, it must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex.2001). In reviewing such a matter-of-law challenge, the reviewing court employs a two-part test. *Pac. Employers Ins. Co. v. Dayton*, 958 S.W.2d 452, 455 (Tex.App.-Fort Worth 1997, pet. denied) (citing *Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931, 940 (Tex.1991)). The reviewing court first examines the record for evidence that supports the finding, while ignoring all evidence to the contrary. *Dow Chem. Co.*, 46 S.W.3d at 241. If there is no evidence to support the finding, the reviewing court will then examine the entire record to determine if the contrary proposition is established as a matter of law. *Id.* The issue should be sustained only if the contrary proposition is conclusively established. *Id.*

### 2. Factual-sufficiency standard

In a factual-sufficiency review, we must examine both the evidence supporting and contrary to the judgment. *See Dow Chem. Co.*, 46 S.W.3d at 242; *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989). The jury is the sole judge of witnesses' credibility, and it may choose to believe one witness over another; a reviewing court may not im-

pose its own opinion to the contrary. *See Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 761 (Tex.2003).

■ In reviewing a factual-sufficiency challenge to a jury finding on an issue on which the party did not have the burden of proof, we consider and weigh all of the evidence and set aside the verdict only if the evidence that supports the jury finding is so weak as to make the verdict clearly wrong and manifestly unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *Bay, Inc. v. Ramos,* 139 S.W.3d 322, 329 (Tex.App.-San Antonio 2004, pet. denied).

■ When a party attacks the factual sufficiency of an adverse finding on an issue on which it has the burden of proof, it must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co.,* 46 S.W.3d at 242. The court of appeals must consider and weigh all of the evidence, and the court can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Id.*

### 3. Review of judgment notwithstanding the verdict

A trial court may render a judgment notwithstanding the verdict on a jury finding if (1) there is no evidence to support the finding or (2) a legal principle precludes recovery. TEX.R. CIV. P. 301 (providing that court "may render judgment non obstante verdicto if a directed verdict would have been proper, and ... may ... disregard any jury finding on a question that has no support in the evidence"); *Tiller v. McLure,* 121 S.W.3d 709, 713 (Tex. 2003); *Williams v. Briscoe,* 137 S.W.3d 120, 124 (Tex.App.-Houston [1st Dist.] 2004, no pet.); *John Masek Corp. v. Davis,* 848 S.W.2d 170, 173 (Tex.App.-Houston [1st Dist.] 1992, writ denied).

■ In reviewing a judgment notwithstanding the verdict, we apply a legal-sufficiency-review standard, viewing the evidence in the light most favorable to the jury's verdict and disregarding all evidence and inferences to the contrary. *Miller,* 102 S.W.3d at 709; *see also City of Keller,* 168 S.W.3d at 823 (explaining when there is "no-evidence" of fact). If more than a scintilla of competent evidence supports the jury's findings, "the jury's verdict and not the trial court's judgment must be upheld." *Miller,* 102 S.W.3d at 709; *Williams,* 137 S.W.3d at 124.

### 4. Sufficiency of Jury Finding Measured by Charge Actually Given to Jury Absent Objection

■ When neither party objects to a jury instruction, an appellate court must review the sufficiency of the evidence in light of the instruction actually given, even if the statement of the law given in the charge is not correct, and even if the charge as given effectively increases the burden of proof on a party beyond that actually required by the correct law or results in a "more rigorous standard" of proof. *See Romero v. KPH Consol., Inc.,* 166 S.W.3d 212, 220–21 (Tex.2005); *Wal-Mart Stores, Inc. v. Sturges,* 52 S.W.3d 711, 715 (Tex.2001); *City of Fort Worth v. Zimlich,* 29 S.W.3d 62, 71 (Tex.2000); *IP Petroleum Co., Inc. v. Wevanco Energy, L.L.C.,* 116 S.W.3d 888, 897, n. 8 (Tex. App.-Houston [1st Dist.] 2003, pet. denied).

### B. Actual and Apparent Authority

### 1. Legal principles Governing Actual and Apparent Authority

#### a. General Agency Principles

■ "An agent is one authorized by another to transact some business for the principal; the relationship is a consensual one between two parties, by which one

party acts on behalf of the other, subject to the other's control." *Jamison v. Nat'l Loan Investors, L.P.,* 4 S.W.3d 465, 468 (Tex.App.-Houston [1st Dist.] 1999, pet. denied). Authorization to act and control of the action are the two essential elements of agency. *Gonzales v. Am. Title Co.,* 104 S.W.3d 588, 593 (Tex.App.-Houston [1st Dist.] 2003, pet. denied).

■■■■ The law does not presume agency, and the party asserting agency has the burden to prove it. *IRA Res., Inc. v. Griego,* 221 S.W.3d 592, 597 (Tex.2007). A "good faith belief" on the part of a third-party that a person with whom it is dealing is the agent of another is not enough to bind the purported principal. *2616 S. Loop LLC v. Health Source Home Care, Inc.,* 201 S.W.3d 349, 356 (Tex.App.-Houston [14th Dist.] 2006, no pet.); *Coker v. Cramer Fin. Grp., Inc.,* 992 S.W.2d 586, 595 (Tex.App.-Texarkana 1999, no pet.). A principal is liable for the acts of another acting as its agent only when the agent has actual or apparent authority to do those acts or when the principal ratifies those acts. *Spring Garden 79U, Inc. v. Stewart Title Co.,* 874 S.W.2d 945, 948 (Tex.App.-Houston [1st Dist.] 1994, no pet.). An agent's authority to act on behalf of a principal depends on words or conduct by the principal either to the agent (actual authority) or to a third-party (apparent authority). *Id.* at 950; *see also Walker Ins. Servs. v. Bottle Rock Power Corp.,* 108 S.W.3d 538, 550 (Tex.App.-Houston [14th Dist.] 2003, no pet.); *Suarez v. Jordan,* 35 S.W.3d 268, 272–73 (Tex.App.-Houston [14th Dist.] 2000, no pet.).

### b. Actual Authority

■■■■ Actual authority includes both express and implied authority. *2616 S. Loop LLC,* 201 S.W.3d at 356; *Spring Garden 79U,* 874 S.W.2d at 948. Express authority is delegated to an agent by words of the principal that expressly and directly authorize the agent to do an act or series of acts on behalf of the principal. *Crooks v. MI Real Estate Partners, Ltd.,* 238 S.W.3d 474, 483 (Tex.App.-Dallas 2007, pet. denied). Implied authority is the authority of an agent to do whatever is necessary and proper to carry out the agent's express powers. *Id.* Implied agency therefore exists only as an adjunct to express actual authority; an agent that does not have express authority cannot have implied authority. *Id.; Spring Garden 79U,* 874 S.W.2d at 948.

■■■■ Actual authority denotes the authority which a principal (1) intentionally confers upon an agent, (2) intentionally allows the agent to believe he possesses, or (3) by want of ordinary care allows the agent to believe himself to possess. *Behring Intern., Inc. v. Greater Houston Bank,* 662 S.W.2d 642, 649 (Tex.App.-Houston [1st Dist.] 1983, writ dism'd); *see also Crooks,* 238 S.W.3d at 483. In order to prove actual authority, therefore, there must be evidence that either (1) the principal intentionally conferred authority on another to act as its agent, or (2) the principal intentionally, or by a want of due care, allowed another to believe that it possessed authority to act as the principal's agent. *See 2616 S. Loop LLC,* 201 S.W.3d at 356; *Spring Garden 79U,* 874 S.W.2d at 949–50.

■■■■ Accordingly, in determining whether a party had actual authority to act for another, we examine the words and conduct by the principal to the alleged agent regarding the alleged agent's authority to act for the principal. *See Walker Ins. Servs.,* 108 S.W.3d at 550; *Suarez,* 35 S.W.3d at 273; *Spring Garden 79U,* 874 S.W.2d at 950.

### c. Apparent Authority

Apparent authority is the power of an agent to affect the legal relations of the principal by transactions with a third person. *Ames v. Great S. Bank,* 672 S.W.2d 447, 450 (Tex.1984). An agent acting within the scope of his apparent authority binds the principal as if the principal itself had taken the action. *Id.* Apparent authority is based on estoppel, and only the conduct of the principal in leading a third party to believe that the agent has authority may be considered. *Gaines v. Kelly,* 235 S.W.3d 179, 182 (Tex.2007); *NationsBank, N.A. v. Dilling,* 922 S.W.2d 950, 953 (Tex.1996). Declarations of authority by the alleged agent, without more, do not establish either the existence or the scope of the alleged authority. *Gaines,* 235 S.W.3d at 183–84. Rather, the reviewing court looks to "acts of participation, knowledge, or acquiescence by the principal." *Ins. Co. of N. Am. v. Morris,* 981 S.W.2d 667, 672 (Tex.1998). Without the principal's participation, either through its "acts or knowledge of, and acquiescence in those of the agent," no mere combination of circumstances, including acts of the purported agent which may mislead persons into a false inference of authority, however reasonable, will serve as the predicate for apparent authority. *Hall v. F.A. Halamicek Enters., Inc.,* 669 S.W.2d 368, 375 (Tex.App.-Corpus Christi 1984, no pet.); *see also Sikes v. Heritage Oaks W. Ret. Vill.,* 238 S.W.3d 807, 810 (Tex.App.-Waco 2007, pet. denied); *Suarez,* 35 S.W.3d at 268; *Disney Enterps. Inc. v. Esprit Fin., Inc.,* 981 S.W.2d 25, 30 (Tex.App.-San Antonio 1998, pet. dism'd w.o.j.).

Apparent authority arises either from (1) a principal knowingly permitting an agent to hold himself out as having authority, or (2) a principal's actions which lack such ordinary care as to clothe an agent with the indicia of authority, thus leading a reasonably prudent person to believe that the agent has the authority he purports to exercise. *Gaines,* 235 S.W.3d at 182. The standard used is that of "a reasonably prudent person, using diligence and discretion to ascertain the agent's authority." *Id.* at 182–83 (citing *Chastain v. Cooper & Reed,* 152 Tex. 322, 257 S.W.2d 422, 427 (1953)). In order for apparent authority to be established, it is also essential that the principal have full knowledge of all material facts at the time of the conduct alleged to be the basis for the estoppel. *Gaines,* 235 S.W.3d at 182; *Rourke v. Garza,* 530 S.W.2d 794, 803 (Tex.1975). Because apparent authority is an estoppel principle, a party seeking to recover under such legal theory must show justifiable reliance on the principal's words or conduct resulting in harm to the party. *See Tex. S. Rentals, Inc. v. Gomez,* 267 S.W.3d 228, 246 (Tex.App.-Corpus Christi 2008, no pet.) (citing *Baptist Mem. Hosp. Sys. v. Sampson,* 969 S.W.2d 945, 948 & n. 2 (Tex.1998) (holding that apparent agency in Texas is based on "the notion of estoppel, that is, a representation by the principal causing justifiable reliance and resulting harm.")).

Accordingly, in order to determine an agent's apparent authority, we examine the conduct of the principal and the reasonableness of the third party's assumptions regarding authority. *See Gaines,* 235 S.W.3d at 183.

### 2. The Judgment Notwithstanding the Verdict on Actual Authority

We consider first Cotton Valley's sole issue. Cotton Valley asserts that the trial court erred in rendering a judgment notwithstanding the verdict on the issue of actual authority and argues that "there was factually and legally sufficient evidence to support the actual authority finding." As we have noted, a challenge to a

trial court's rendition of a judgment notwithstanding the verdict is reviewed under a legal-sufficiency standard. *Miller*, 102 S.W.3d at 709. We therefore consider whether, viewing the evidence in the light most favorable to the jury verdict, there is more than a scintilla of evidence supporting the jury's verdict on actual authority. *Id.*

■ Under the charge actually given to the jury in this case, in order for the jury to determine that actual "authority" existed for Westfield to act for Reliant, it was required to find that Reliant had an "agreement" with Westfield that "Westfield act on behalf and for the benefit of Reliant in purchasing gas from Cotton Valley." [22] The charge as submitted to the jury only permitted the jury to find actual authority by way of an intentional conference of authority in an agreement between the parties; the charge did not provide the jury with the option to find actual authority on any other allowable legal basis, such as by Reliant intentionally, or by want of due care, allowing Westfield to believe that it had authority. *See Behring Int'l, Inc.*, 662 S.W.2d at 649. Because neither party objected to the wording of this instruction as given to the jury,[23] we measure the sufficiency of the evidence to prove actual agency in light of the actual instruction given to the jury, rather than by the instruction that should have been given. *See Scottsdale Ins. Co. v. Nat'l Emergency Servs., Inc.*, 175 S.W.3d 284, 300–01 (Tex. App.-Houston [1st Dist.] 2004, pet. denied); *see also Ancira Enters., Inc. v. Fischer*, 178 S.W.3d 82, 93 (Tex.App.-Austin 2005, no pet.) (reviewing sufficiency by definition of "malice" actually submitted to jury rather than stricter definition of malice that was legally applicable).

■ Reviewing the record in the light most favorable to the jury's finding, we conclude that the trial court did not err in rendering the judgment notwithstanding the verdict on the issue of actual authority. The answers of Gouge and Dunnavant in cross-examination relied upon by Cotton Valley to support its issue do not present any evidence that an actual agreement between Reliant and Westfield existed that "Westfield act on behalf and for the benefit of Reliant in purchasing gas from Cotton Valley." [24] While there was evidence

22. See Definitions and Instructions for Jury Question No. 1.

23. Cotton Valley made no objection to the charge. Reliant objected to the giving of any instruction on either actual or apparent agency on the ground that there was no evidence of either actual or apparent agency to support the giving of any instructions, including no evidence that Cotton Valley knew or relied on any acts or omissions by Reliant. Reliant also objected that the agency issue should be submitted "in broad form; so two separate lines." However, neither Reliant nor Cotton Valley raised any objection to the wording of the "instructions and definitions" of either actual or apparent agency given to the jury, nor does either claim on appeal that the instructions actually given were defective. "A party objecting to a charge must point out distinctly the objectionable matter and the grounds of objection. Any complaint … on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections." Tex.R. Civ. P. 274. A general objection to the submission of an instruction on the ground that it was "not raised by the evidence" will not serve to alert the trial court to a specific complaint regarding any defects in wording of the instruction actually given. *See Davis v. Campbell*, 572 S.W.2d 660, 663 (Tex.1978).

24. Cotton Valley relies on three answers by Gouge in cross-examination by Cotton Valley, in which Gouge (1) acknowledged that he had an agreement with Reliant that it would "take" whatever gas he could aggregate; and (2) answered "Yes" to the follow-up question, as to whether he "had the authority from Reliant to go out and get this gas; you negotiate a price and terms for gas that was to be delivered to Reliant? That was the deal, cor-

of a written base-purchase agreement between Reliant and Westfield establishing a purchaser-seller relationship, and evidence of an oral agreement between them that Reliant would purchase as much gas as Gouge could aggregate from producers for delivery to Reliant, there was no evidence of any agreement that Westfield "act on behalf and for the benefit of Reliant in purchasing gas from Cotton Valley." The testimony cited by Cotton Valley would, at most, "create a mere surmise or suspicion" regarding the existence of such an agreement, see Ford Motor Co., 135 S.W.3d at 601, and even such a "surmise or suspicion" would have been dispelled by (1) the direct evidence of the written agreement between the parties establishing a seller-purchaser, not a principal-agent, relationship, (2) the testimony by Brown and Gouge that the "price and terms of gas" negotiated by Gouge with Cotton Valley were not the "price and terms" applicable to Reliant, but were applicable only to Westfield, and (3) the specific testimony from Dunnavant denying that Reliant had given Westfield authority to buy Cotton Valley's gas on Reliant's behalf and from Gouge that he had been acting on Westfield's behalf, not Reliant's, when he purchased Cotton Valley's gas.[25]

We overrule Cotton Valley's sole issue.

### 3. The Jury's Verdict of Apparent Authority

### a. Reliant's Contentions and Our Standard of Review

In its first issue, Reliant asserts that there is no evidence to support the jury's finding that Westfield had apparent authority to act for Cotton Valley or, alternatively, that the jury's finding was against the great weight and preponderance of the evidence.

Reliant complains that (1) there was no evidence that Cotton Valley exercised "reasonable diligence to ascertain the fact or scope of Westfield's apparent authority," (2) there was no conduct on the part of Reliant that bestowed indications of authority on Westfield, and (3) there was no evidence of "reasonable reliance" by Cotton Valley on any conduct by Reliant. Reliant contends that, in reviewing the sufficiency of the evidence to support this finding, we may not consider the acts of Gouge, any facts not known to Cotton Valley, or any conduct by Cotton Valley that was consistent with the parties' actual relationship. Reliant then argues that any "omissions" by it cannot support an apparent authority finding, that there was no evidence that Cotton Valley exercised diligence to ascertain the fact or scope of Westfield's apparent authority, there was no evidence of any acts on its part which bestowed indications of authority on Westfield, and that there was no evidence of "reasonable reliance" by Cotton Valley on any conduct by Reliant.

---

rect?"; and (3) answered "Yes," when asked if Reliant knew that he was using their name in his attempts to find gas to aggregate. Cotton Valley also quotes an answer by Dunnavant acknowledging the arrangement with Gouge that if Gouge could bring Reliant packages of gas in certain areas, Reliant "w[as] interested in that" and that Gouge "filled a slot" that its own people did not.

**25.** We do not address Cotton Valley's arguments regarding evidence of Reliant's "lack

of due care" because, as noted, the jury was not authorized by the charge to find actual authority under that legal principle. We likewise do not address Cotton Valley's arguments as to the factual sufficiency of the evidence to support the jury's finding of actual authority because a review of a trial court's rendition of a judgment notwithstanding the verdict is conducted under legal-sufficiency standards. See Miller, 102 S.W.3d at 709.

In conducting our legal-sufficiency review, we consider the evidence in the light most favorable to the fact-finder's decision and indulge every reasonable inference that would support it. *City of Keller,* 168 S.W.3d at 822. Reliant must establish that there is "no evidence" to support the challenged finding. *Chapman,* 118 S.W.3d at 751. In reviewing Reliant's factual-sufficiency challenges, we must consider and weigh all of the evidence and may set aside the verdict only if the evidence that supports the challenged jury finding is so weak as to make the verdict clearly wrong and manifestly unjust. *Cain,* 709 S.W.2d at 176; *Bay, Inc.,* 139 S.W.3d at 329.

Because there was no objection to the language of the jury charge regarding apparent authority,[26] we measure the sufficiency of the evidence to support the jury's finding of apparent authority in light of the jury charge actually given.[27] *See Romero,* 166 S.W.3d at 220–21. Under the charge submitted, the jury was authorized to find that apparent authority existed if Reliant

(1) knowingly permitted Westfield to hold itself out to Cotton Valley as having authority to act on Reliant's behalf in purchasing gas from Cotton Valley, or

(2) through lack of ordinary care, bestowed on Westfield such indications of authority that would lead a reasonably prudent person to rely on the apparent existence of authority to his detriment.

The jury was also instructed that (1) "only the acts *or omissions*[28] of Reliant"

could be considered in determining whether apparent authority existed and (2) apparent authority could only be based on facts known to, and relied upon by, Cotton Valley. (Emphasis added.)

### b. "Reasonable Diligence to Ascertain Fact or Scope of Westfield's Apparent Authority"

We first note that, under the jury charge submitted, the jury was not required to consider whether Cotton Valley exercised "reasonable diligence to ascertain the fact or scope of Westfield's apparent authority" in making its apparent authority finding. "[R]easonable diligence to ascertain [an] agent's authority" is part of the standard under Texas law for determining whether a person is "reasonably prudent" in the context of apparent authority, *see Gaines,* 235 S.W.3d at 182–83, and, therefore, an instruction requiring a jury to evaluate "a reasonably prudent person" under that standard would be appropriate. *See* TEX.R. CIV. P. 273, 277. However, in the instant case, no such instruction was requested by any party, nor was its omission objected to by either party. Nor was the jury instructed that Cotton Valley was not entitled to recover on a theory of apparent authority in the absence of the use of "reasonable diligence to ascertain [Westfield's] authority."

■ Instead, the jury was instructed that it could find apparent authority if it found, by a preponderance of the evidence,

---

26. Neither party raises any complaint about the charge on appeal.

27. The language of the charge given is almost exactly the same language proposed by Reliant in its First Amended Proposed Jury Charge and is based on Texas Pattern Jury Charge 101.4. COMM. ON PATTERN JURY CHARGES, STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES: BUSINESS CONSUMER INSURANCE EMPLOYMENT PJC 101.4 (2010).

28. The phrase "or omissions" was not contained in Reliant's First Amended Proposed Jury Charge, nor is it a part of the Texas Pattern Jury Charge 101.4. However, Reliant lodged no objection below to the inclusion of this language and has not claimed on appeal that this instruction was defective because of the inclusion of this phrase.

that through lack of ordinary care, Reliant bestowed on Westfield such indications of authority that would lead a *"reasonably prudent person"* to rely on the apparent existence of authority to his detriment. On appeal, we must measure the sufficiency of the evidence by the language actually given to the jury in the charge, rather than by the correct legal standard under Texas law of "a reasonably prudent person, acting with diligence and discretion to ascertain the agent's authority" as set out in *Gaines. See Romero,* 166 S.W.3d at 220–21; *Sturges,* 52 S.W.3d at 715; *Zimlich,* 29 S.W.3d at 71; *see also Kroger Co. v. Brown,* 267 S.W.3d 320, 323 (Tex.App.-Houston [14th Dist.] 2008, no pet.) (measuring sufficiency by commonly-understood meaning of disfigurement, when definition of disfigurement recognized in Texas law was not submitted in jury charge); *EMC Mortg. Corp. v. Jones,* 252 S.W.3d 857, 868–69 (Tex.App.-Dallas 2008, no pet.) (reviewing sufficiency based on common meaning of "unreasonable," rather than correct legal standard, when no definition or instruction placing "unreasonable" in proper legal context was given to jury and no objection made to language of charge); *Ancira Enters., Inc.,* 178 S.W.3d at 93 (reviewing sufficiency under less-stringent definition of malice than actually applicable

by law to retaliation suits because jury charge provided less-stringent definition rather than correct stricter definition). The jury was authorized, under the charge given, to find apparent authority without evidence of Cotton Valley's "using diligence and discretion to ascertain [Westfield's] authority."

We overrule this portion of Reliant's legal-sufficiency challenge.

### c. Conduct of Reliant and Cotton Valley's Reliance

 In our review of the remaining sufficiency complaints regarding apparent authority, consistent with the instructions given to the jury, we consider (1) only the "acts and omissions of Reliant,"[29] not those of Gouge or Westfield, and (2) only the facts known to, and relied upon by Cotton Valley.[30]

### (i) Reliant's Conduct Bestowing Indications of Authority on Westfield

Reliant argues that Cotton Valley relies principally on representations by Westfield to Cotton Valley and facts that were not known to Cotton Valley, which it properly points out may not be relied upon in establishing apparent authority.

---

**29.** As previously noted, Reliant argues that omissions on the part of Reliant may not be considered as evidence to support the jury's finding. However, because the jury was explicitly permitted to consider the omissions of Reliant in making its determination, and there was no objection lodged to this instruction, we must review the sufficiency of the evidence in light of the instruction actually given to the jury. *See Romero,* 166 S.W.3d at 220–21; *Zimlich,* 29 S.W.3d at 71.

**30.** Reliant also contends that we may not consider any actions by Reliant that are consistent with its actual relationship with Westfield, citing *Gaines v. Kelly,* 235 S.W.3d 179, 184 (Tex.2007). We disagree. We do not

read the cited passage to constitute a prohibition against considering actions by a principal which are consistent with its actual relationship with a purported agent in determining apparent authority. Rather, the cited passage simply held, under the facts of that case, that the failure of the principal to explain to a party that a special agent did not have also some further additional authority was not conduct from which that party might reasonably infer further authority than the agent actually possessed. However, we agree that actions by a principal that are consistent with its actual relationship with a purported agent, standing alone, would not suffice to establish apparent authority.

Reliant also asserts that Reliant made no representations about Westfield before Cotton Valley began selling its gas in April 1999 in the arrangement at issue, and that any actions taken later by Reliant—such as receiving the gas directly and communicating with Cotton Valley through schedulers—were consistent with its actual relationship with Westfield and so could not have been relied upon by Cotton Valley as bestowing indications of authority on Westfield.

Reliant is correct that the record indicates that Reliant took no actions prior to the April 1999 contract between Cotton Valley and Westfield upon which Cotton Valley could have relied in making such contract. However, the record reveals that the contract, although supposed to be self-renewing according to Gouge, was not, and so Cotton Valley's decisions to sell its gas were made on a monthly basis and Cotton Valley's initial decision to sell the July 2001 gas in question was made on or about June 28, 2001, when the first nomination was sent. We therefore consider whether Reliant engaged in any "acts or omissions" prior to June 28, 2001 which bestowed indications of authority on Westfield.

Cotton Valley contends that (1) Reliant's taking physical delivery of the gas directly from Cotton Valley, (2) its arrangements with Westfield regarding the use of its schedulers, accounting department, and transportation agreements on the Williams pipeline, (3) its allowing its name to be disclosed to Cotton Valley in contravention of the usual business practices and its regular communications with Cotton Valley, and (4) its direct communications with Cotton Valley on end-month reconciliations, gas-balance transfers, and ultimately, its direct acceptance of the second July gas-production packet, all served to bestow indications of authority on Westfield.

█ Reviewing the legal sufficiency of the evidence to support the jury's finding of apparent authority under either paragraph of the charge given, we conclude that there is some evidence to support the jury's finding that there were "acts or omissions" by Reliant prior to June 28, 2001 which bestowed on Westfield indications of authority. While we would agree that there was no evidence to support a finding under the first paragraph (that Reliant knowingly permitted Westfield to hold itself out as having authority to contract on Reliant's behalf),[31] we hold that there is some evidence to support a jury finding under the second paragraph (that Reliant, "through lack of ordinary care, bestowed on Westfield such indications of authority that would lead a reasonably prudent person to rely on the apparent existence of authority to his detriment."). Considering the usual practices of the gas-selling business as testified to at trial,[32] we

---

**31.** In support of a jury finding under this prong, Cotton Valley points only to the evidence that Gouge used Reliant's name in its marketing efforts and observes that "this is the only evidence in the record on this point." We note that there was no specific evidence that Reliant knew that Gouge used Reliant's name in its marketing efforts to Cotton Valley. While Gouge initially answered "Yes" when asked about Reliant's knowledge of his use of the Reliant name with Cotton Valley, an objection was lodged to the question, the question was rephrased, and Gouge then answered that he could not recall a specific conversation with Reliant regarding Cotton Valley prior to the deal being struck. Moreover, even if Reliant knew that Gouge used Reliant's name in its marketing efforts to Cotton Valley, this fact alone is not evidence that Reliant "knowingly permitted Westfield to hold itself out *as having authority to contract on Reliant's behalf.*"

**32.** See *Elliot Valve Repair Co. v. B.J. Valve & Fitting Co.,* 675 S.W.2d 555, 562 (Tex.App.-Houston [1st Dist.] ), *rev'd on other grounds,* 679 S.W.2d 1 (Tex.1984); *Behring Int'l, Inc.*

conclude that there was some evidence of a "pattern of conduct"[33] by Reliant in its dealings with Cotton Valley that amounted to a "lack of ordinary care" that bestowed "indications of authority" on Westfield. Although there were facts known to Cotton Valley, such as the different prices paid by Westfield and Reliant for the gas, suggesting that Westfield was not Reliant's actual agent, the actual—and unusual—course of dealing between Reliant and Cotton Valley regarding the gas arrangement, sometimes involving Westfield (as in the escrow account), sometimes not, particularly the direct exchange of gas between Cotton Valley and Reliant in gas-imbalance transfers, and especially the August 1999 transaction in which Reliant essentially "took" Cotton Valley's gas, supported Cotton Valley's belief in a "direct deal" between Cotton Valley and Reliant and bestowed indications of authority on Westfield as Reliant's apparent agent in the arrangement. Such evidence at least "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions," *Ridgway*, 135 S.W.3d at 601. We therefore hold that the evidence is legally sufficient to support the jury's finding of conduct by Reliant that "bestowed on Westfield ... indications of authority."

### (ii) Reasonable Reliance by Cotton Valley

We next consider whether there is some evidence to support a finding of reasonable reliance on the part of Cotton Valley. In doing so, we look at Reliant's conduct from March 31, 1999 through June 28, 2001. Reliant argues that Cotton Valley did not rely on Reliant's actions as bestowing authority on Westfield to act for Reliant, or that its reliance was not reasonable, because Cotton Valley (1) signed documents that listed Reliant as a resale customer and indicated that Cotton Valley was selling gas to Westfield and Westfield was selling gas to Reliant, (2) took actions to ensure that it received payment by Westfield through a proposed escrow agreement, and (3) knew that the price that it received from Westfield and the price that Reliant paid for the gas differed. We review the sufficiency of the evidence as to reliance in light of the jury charge actually given. *See Romero*, 166 S.W.3d at 220–21; *Zimlich*, 29 S.W.3d at 71. The jury charge mentions reliance twice: (1) in the second paragraph, which permits the jury to find that actual authority exists if Reliant, "through lack of ordinary care, bestowed on Westfield such indications of authority that would lead a *reasonably prudent person to rely* on the apparent existence of authority to his detriment" and (2) in an instruction which stated that "[a]pparent authority may only be based on facts known to, *and relied upon by, Cotton Valley*." (Emphasis added.)

Reliant argues that its cited evidence conclusively proves that Cotton Valley did not rely on its dealings with Reliant, or at least not reasonably so.[34]

---

*v. Greater Houston Bank*, 662 S.W.2d 642, 649 (Tex.App.-Houston [1st Dist.] 1983, writ dism'd).

**33.** *See Ames v. Great S. Bank*, 672 S.W.2d 447, 450 (Tex.1984) (considering whether there was "pattern of conduct" by principal that would establish apparent agency).

**34.** Reliant refers us to *Sanders v. Total Heat & Air, Inc.*, 248 S.W.3d 907 (Tex.App.-Dallas 2008, no pet.). We find Sanders distinguishable. In Sanders, the Dallas Court of Appeals found it unreasonable for a subcontractor to believe that a general contractor was a homeowner's agent, even though the owner had direct dealings with the subcontractor. In its opinion, the court of appeals held that "in light of [the subcontractor's] many years of experience in the construction industry, his perception that [the general contractor] was an agent, when the [homeowner twice] told

We disagree. As discussed previously, there is evidence in the record of an unusual course of dealings between Reliant and Cotton Valley that supports a belief in a "direct deal" between Reliant and Cotton Valley. There is also evidence that Cotton Valley relied on Reliant's conduct during this unusual course of dealings in making its decision to sell the July 2001 gas for delivery to Reliant. We hold that the evidence in the record supporting the jury findings on reliance "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions" as to whether the indications bestowed by Reliant were such as would lead a *"reasonably prudent person to rely* on the apparent authority to his detriment" and whether Reliant's acts were actually *"relied upon by [ ] Cotton Valley."* We therefore hold that the evidence is legally sufficient to support the jury's findings regarding reliance.

#### d. Review of Factual–Sufficiency Complaint

Reliant's entire factual-sufficiency challenge to the jury's finding on apparent authority, after setting out the standard of review for legal sufficiency, reads:

> Here, considering and weighing all the evidence in support of and contrary to

the subcontractor that [the general contractor] was her general contractor, was not reasonable." *Id.* at 917. The phrase "in light of [the subcontractor's] many years of experience in the construction industry," however, is what propels the finding of the unreasonableness of the subcontractor's reliance in *Sanders*, and distinguishes it from the case before us. In the construction industry, a subcontractor is required (absent an express contract with the owner) to look to the general contractor for payment, not the homeowner, "even if 'the work is done under the direction of and in accordance with the plans furnished by the owner.'" *Id.* at 913 (internal citations omitted). Therefore, an owner's direct dealings with a subcontractor do not make an owner liable for payment and a

the apparent authority finding demonstrates any evidence is factually insufficient. Even accepting *arguendo* the correctness of Cotton Valley's assertion that some evidence supports an apparent authority finding, that evidence is so weak as to render the jury's finding manifestly erroneous when properly weighed against all the documentary and testimonial evidence that Cotton Valley could not have relied on that evidence because it was on notice that the terms of the parties' relationships were inconsistent with an agency relationship. At a minimum, a new trial is required.

For the reasons set out in our discussion of the legal sufficiency of the evidence, we disagree. After considering and weighing all of the evidence, we hold that the evidence supporting the jury's finding and apparent authority is not so weak as to make the verdict clearly wrong and manifestly unjust. *See Cain,* 709 S.W.2d at 176; *Ramos,* 139 S.W.3d at 329.

We overrule Reliant's first issue.

### C. Affirmative Defense of Quasi–Estoppel

■ In its second issue, Reliant complains that it proved its affirmative defense

subcontractor may still only look to the general contractor for payment, unless the subcontractor has an express contract directly with the owner. *Id.; see also City of Corpus Christi v. Acme Mech. Contractors, Inc.,* 736 S.W.2d 894, 898 (Tex.App.-Corpus Christi 1987, writ denied). Accordingly, in light of the usual practices of the construction industry, it was not reasonable for the subcontractor in Sanders to believe that the general contractor was acting as the homeowner's agent, rendering the homeowner liable for payment, simply because the homeowner dealt directly with the subcontractor, especially in light of the homeowner's (the alleged principal) statements directly to the "relying" party confirming the relationship between the owner and the general contractor.

of quasi-estoppel as a matter of law and so it effectively challenges the legal sufficiency of the adverse jury finding on quasi-estoppel in answer to jury question No. 2.[35] *See* Tex.R.App. P. 38.1(f), 38.9; *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989) (holding that attack on adverse jury finding on which appellant had burden of proof should be reviewed as assertion that appellant had established its affirmative defense "as a matter of law."). Reliant argues that because Cotton Valley always previously invoiced and looked to Westfield for the gas delivered to Reliant, including the July 2001 gas, Cotton Valley is now estopped, as a matter of law, from seeking payment from Reliant for the July 2001 gas.

"Quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken." *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex.2000). "The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit." *Id.* "Thus, quasi-estoppel forbids a party from accepting the benefits of a transaction and then subsequently taking an inconsistent position to avoid corresponding obligations or effects." *Eckland Consultants, Inc. v. Ryder, Stilwell Inc.*, 176 S.W.3d 80, 87 (Tex. App.-Houston [1st Dist.] 2004, no pet.).

In order to meet its burden to show that it proved its affirmative defense of quasi-estoppel, Reliant must demonstrate on appeal there is evidence that establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co.*, 46 S.W.3d at 241. In reviewing such a matter-of-law challenge, we first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary; only if there is no evidence to support the finding do we then examine the record to determine if the contrary proposition is conclusively established as a matter of law. *See id.* at 241–42.

Reviewing the entire record, we conclude that Reliant has not met its burden. There is some evidence in the record, particularly in the testimony of Brown and Eakin, and in the evidence regarding the nature of the payment arrangement, which from the inception specifically involved Reliant paying funds into the escrow account specifically for the gas purchased from Cotton Valley, that would support a jury finding that Cotton Valley's seeking of payment from Reliant after July 2001 was not inconsistent with its invoicing of Westfield for the gas delivered to Reliant. There was evidence in the record that, prior to July 2001, Cotton Valley's position was that Reliant was responsible for the payment of the gas purchased, even though invoicing was made to, and payment made by, Westfield. Reliant acknowledges some of such evidence, but argues that it is "not credible" and so amounts to "no evidence."

The jury is the sole judge of the credibility of witnesses and a reviewing court may not impose its own opinion to the contrary. *City of Keller*, 168 S.W.3d at 819. It is also the province of the jury to draw whatever inferences it wishes from the evidence if more than one inference is possible. *Id.* at 821. If the evidence at trial would enable reasonable and fair-minded people

---

**35.** Reliant also argues that the evidence is factually insufficient to support this adverse jury finding. However, as adverse jury findings on which an appellant has the burden of proof are to be reviewed under a legal-sufficiency standard, *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989), we do not address Reliant's factual-sufficiency contention.

to differ in their conclusions, a legal-sufficiency review is at an end. *Id.* at 822.

In the present case, we conclude that reasonable and fair-minded people could differ in their conclusions as to whether Cotton Valley took the position, prior to July 2001, that Reliant was ultimately liable for payment for the gas, even though Cotton Valley previously sought payment from Westfield, not Reliant, for the gas. Accordingly, we hold that there is some evidence to support the jury's finding on the affirmative defense of quasi-estoppel.

We overrule Reliant's second issue.

### Evidentiary Complaints

In its third issue, Reliant complains of the admission of certain evidence, offered by Cotton Valley as relevant to the issue of actual authority, namely (1) evidence that Westfield acted as Reliant's actual agent for transactions with three different companies, (2) evidence of Reliant's "early-pays" of Westfield, and (3) evidence of some correspondence that Westfield sent to another company and of which Cotton Valley did not know. Reliant asserts that this evidence was not relevant as to either actual or apparent authority and therefore mislead the jury.

We review a trial court's evidentiary rulings for an abuse of discretion. *See Horizon/CMS Healthcare Corp. v. Auld,* 34 S.W.3d 887, 906 (Tex.2000). A trial court abuses its discretion when it acts without regard for any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex. 1985). Even if an evidentiary ruling is erroneous, we will not reverse unless the erroneous ruling probably caused the rendition of an improper judgment. *See Auld,* 34 S.W.3d at 906. Reversible error in connection with rulings on questions of evidence usually does not occur unless the complaining party can demonstrate that the whole case turned on the evidence that was admitted. *City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753–54 (Tex.1995). We determine whether the case turns on the admitted evidence by reviewing the entire record. *See id.*

We first note that, although the trial court clearly indicated to the parties that it was admitting the evidence solely as to the issue of actual authority, Reliant did not request any limiting instruction to the jury, either at the time that the evidence was offered or in the charge to the jury. Accordingly, if the evidence was admissible for any purpose, the trial court's admission should be affirmed. *See* TEX.R. EVID. 105(a); *Auld,* 34 S.W.3d at 906. We consider first the purpose for which the trial court actually admitted the evidence—to show actual authority.

■ As to actual authority, Reliant argues that the challenged evidence was not relevant because "the only relevant evidence" in determining actual authority is (1) evidence of communications between the principal and the agent conferring authority and (2) evidence of the alleged agent's understanding about its authority. We disagree.

■ Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX.R. EVID. 401. In determining relevancy, we look at the purpose of offering the evidence and, if there is some logical connection, either directly or by inference, between the fact offered and the fact to be proved, the relevancy test is satisfied. *Serv. Lloyds Ins. Co. v. Martin,* 855 S.W.2d 816, 822 (Tex.App.-Dallas 1993, no pet.).

Reviewing the record as a whole, we conclude that the trial court did not abuse

its discretion in admitting the challenged evidence. The evidence of early pays and Westfield's relationship with Reliant as to other gas-producing companies was admitted for the purpose of demonstrating that Reliant and Westfield had oral agreements regarding their relationship and Westfield's authority that were not encompassed by the sole written contract between them and so would be logically connected to the communications regarding authority between Reliant and Westfield.[36] Moreover, reviewing the record as a whole, it is clear that the challenged evidence makes up only a small part of the evidence and it cannot reasonably be said that the verdict would have probably been different if it had been excluded.

We overrule Reliant's third issue.

### New Trial for Cumulative Error

In its fourth and final issue, Reliant requests this Court to "grant a new trial" in the interest of justice due to "cumulative error" by way of "the erroneous admission of inadmissible and prejudicial evidence in combination with Cotton Valley's improper argument."

■ We first note that, as a reviewing court, we may not "grant a new trial in the interest of justice." *See In re Columbia Med. Ctr., L.P.,* 290 S.W.3d 204, 213 (Tex. 2009). A trial court has the discretion to do so, but we as a reviewing court have no such authority. *Id.* at 211 ("[A] trial court [has] considerable discretion to set aside a jury verdict, even on its own motion. . . . [a]ppellate judges have much less discretion . . ."). *Compare* Tex.R. Civ. P. 320 (providing trial court authority to grant "a new trial . . . for good cause") *with* Tex. R.App. P. 43.3 (providing court of appeal authority to *remand* for new trial in interest of justice, if it concludes there is reversible error in trial court's judgment).

To the extent that Reliant is raising a complaint regarding improper jury argument by Cotton Valley, we note that no objection was made to this argument, nor did Reliant claim in its motion for new trial that the argument was incurable, and so any complaint regarding the argument is waived. *See* Tex.R.App. P. 33.1(a)(1)(A); *Arias v. Brookstone, L.P.,* 265 S.W.3d 459, 467 (Tex.App.-Houston [1st Dist.] 2007, pet. denied). To the extent that Reliant is arguing that we should remand for a new trial because of the admission of the complained-of evidence in issue three, we have already determined there was no error as to that admission so there is no basis for a remand.

We overrule Reliant's fourth issue.

### Conclusion

We affirm the judgment of the trial court.

---

**36.** Reliant also complains of evidence of a solicitation letter to an unrelated company by Westfield. Reliant fails to provide a specific citation to the record identifying where this evidence was admitted or where any objection was made to its admission. Cotton Valley states that no solicitation letter was admitted and that there was only evidence that marketing letters were sent out that used Reliant's name. Because no specific citations were provided identifying this particular challenged evidence, we are unable to evaluate this complaint and decline to review it. *See* Tex.R.App. P. 38.1(i) (brief must contain appropriate citations to record); *Nga Van Nguyen v. Kosnoski,* 93 S.W.3d 186, 188 (Tex.App.-Houston [14th Dist.] 2002, no pet.) (holding that appellate court "has no duty to search a voluminous record without guidance from [a party] to determine whether an assertion of reversible error is valid").