**Opinion issued February 28, 2023.**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-21-00083-CV

————————————

**DOUGLAS ELLIMAN REALTY, LLC, Appellant**

**V.**

**GRIFFIN PARTNERS III-520/2017 L.P. AS SUCCESSOR IN INTEREST TO DLF/GP 520 POST OAK, LLC PFP 520 POST OAK, INC. AND 520 PARTNERS, LTD., Appellee**

---

On Appeal from the 157th District Court
Harris County, Texas
Trial Court Case No. 2020-03683

---

## MEMORANDUM OPINION

Appellee filed suit against Appellant Douglas Elliman Realty, LLC stemming

from the purported breach of a commercial property lease. Appellee asserted claims

against Douglas Elliman Realty, LLC and others for tortious interference, conspiracy, and declaratory relief claiming they had interfered with the performance of the commercial property lease by causing the lessee to terminate the lease. In this interlocutory appeal, Appellant Douglas Elliman Realty, LLC challenges the trial court's order denying its special appearance. In its sole issue, it contends the trial court erred in denying its special appearance because it is not subject to general or specific jurisdiction in Texas.

We affirm the trial court's ruling based on specific jurisdiction.

**Factual Background**

Appellee Griffin Partners III – 520/2017 L.P. as Successor in Interest to DLF/GP 520 Post Oak, LLC PFP 520 Post Oak, Inc. and 520 Partners, Ltd. ("Griffin Partners") is a commercial real estate investment, development, and property management firm in Houston, Texas. In 1998, Griffin Partners' predecessor-in-interest executed a lease with tenant John Daugherty Real Estate, Inc. ("JDRE") for commercial offices located at 520 Post Oak Boulevard in Houston, Texas, the terms of which were later extended through May 31, 2027 ("Post Oak Lease").

Appellant Douglas Elliman Realty, LLC ("DE New York") is a limited liability company incorporated in New York with its principal place of business in New York. DE New York is a "holding company that holds the stock or membership interests of certain operating subsidiaries, many of which engage in some aspect of

2

purchasing or selling real estate." DE New York "is not and has never been incorporated or licensed to do business in any state, including the State of Texas, as is required to engage in real estate transaction as a broker." DE New York, along with its affiliates, is one of the largest residential brokerage companies in the United States.

JDRE was a well-regarded real estate firm that specialized in high-end luxury homes and apartments in Houston, Texas. John A. Daugherty, Jr. was its sole shareholder ("Daugherty").

Jacob Sudhoff ("Sudhoff") is a Texas resident who owns several real estate companies in Houston, Texas, including Premier Texas Brokerage LLC ("Premier") and Sudhoff Companies, LLC ("Sudhoff Companies"). Sudhoff's businesses are primarily engaged in the business of sales and marketing of luxury homes and high-density residential condominiums in the Houston market. Catherine Lee ("Lee") is Sudhoff's business partner.

In 2018, Howard Lorber ("Lorber"), DE New York's Executive Chairman, and Kenneth Haber ("Haber"), DE New York's Executive Vice President and General Counsel, began talking to Sudhoff and Lee about a future real estate brokerage business venture. By January 15, 2019, Sudhoff had signed a licensing agreement with DE New York for use of the "Douglas Elliman Real Estate" logo and trade dress. Sudhoff and DE New York, however, soon decided to enter into a

3

real estate brokerage joint venture, rather than a licensing arrangement. In July 2019, DE New York formed Douglas Elliman of Texas, LLC ("DE Texas"), and DE Texas and Premier formed Real Estate Associates of Houston, LLC ("REAH").

Earlier in 2019, Sudhoff had also proposed to Haber and others at DE New York that there was a possibility of "doing some type of arrangement" with JDRE, if DE New York was amenable. Sudhoff testified that prior to entering talks with DE New York, he and Daugherty had been "discussing a potential deal" between Sudhoff Companies and JDRE but that deal never came to fruition. Sudhoff contends that he reached out to Daugherty when Sudhoff was negotiating his joint venture arrangement with DE New York because Sudhoff's business focuses on the Houston condominium market and Sudhoff "was looking to align with a traditional brokerage."

In April 2019, after DE New York "signed off" on the location and before formally establishing a joint venture with Sudhoff or negotiating its details, Sudhoff and Lee leased office space on Kirby Drive in Houston, Texas for the proposed joint venture between Sudhoff and DE New York ("Kirby Lease"). Sudhoff testified that he tried to get a "deal done" with JDRE before they signed the Kirby Lease, but they were unable to do so.

On June 5, 2019, Daugherty and Cheri Fama ("Fama"), JDRE's president, joined Sudhoff for a trip to New York to meet with some of DE New York's senior

4

officers, including Lorber and Haber.  Sudhoff had informed Haber the week before that he was coming to New York, and that he had arranged for Daugherty to join him.  Sudhoff told Haber:

> As timing is now at a critical point for [Daugherty] and his brokerage. We have been in talks with [Daugherty] during the entire time of our talks.  His GCI is 35m. 1.4b a year in Houston.  His firm is 52 years old and [Lorber] had a call with [Daugherty] about 10 months ago.

When asked why Sudhoff arranged for Daugherty to meet with DE New York's officers in June 2019, Daugherty explained, "My understanding was that Douglas Elliman New York was getting into the real estate business in Texas [and] Sudhoff and Lee were going to represent the Texas operation."   According to Daugherty, he understood that Sudhoff was assisting DE New York's entry into the Texas market because Sudhoff "kept representing that Douglas Elliman New York was going to own 51 percent of the Texas operation and that Douglas Elliman New York could fire them, Sudhoff and Lee, but they could not, Lee and Sudhoff, could not fire New York."  This was confirmed by Haber who told Daugherty that DE New York "had complete control of what was going to happen in Texas."  Daugherty testified that Haber also told him that he "was in charge of Texas."  Haber, however, denies telling Daugherty that he "was in charge of Texas, [DE Texas] or [REAH] (neither of which had [] even been formed as of June 2019), and I did not state that [DE New York] was controlling or would control what was going to be done in Texas."

5

On June 7, 2019, Haber sent a mutual Non-Disclosure Agreement ("NDA") to JDRE's Daugherty and Fama. The proposed NDA states in part, "You have expressed an interest in pursuing a business transaction between John Daugherty Realtors and Douglas Elliman Real Estate or its affiliate." The signature block indicates that Haber, as the company's Executive Vice President and General Counsel, would be signing the NDA on behalf of "Douglas Elliman Real Estate." On June 12, 2019, Daugherty sent a revised and executed version of the NDA to Haber. Daugherty's version added a non-solicitation agreement. Haber informed Daugherty that he could not "execute the Agreement as revised" because "DE does not enter into 'non-hire' agreements," and the proposed non-solicitation agreement was not acceptable to Haber.

On June 18, 2019, Lorber sent Scott Durkin ("Durkin"), DE New York's Chief Operating Officer, to Houston, Texas to meet with Sudhoff, Daugherty, and Fama. According to Sudhoff, Sudhoff's meeting with Durkin was one of the final steps to getting Sudhoff's deal done with DE New York. After meeting with Sudhoff, Durkin "gave his blessing to" Lorber and REAH was formed the next month. REAH is the joint venture between DE Texas—DE New York's wholly owned subsidiary—and Premier—Sudhoff's company.

Daugherty, Fama, Sudhoff, Lee, and Durkin had lunch at the River Oaks Country Club in Houston, Texas during Durkin's June 2019 trip to Houston.

6

According to Daugherty, Durkin told him that DE New York would be moving into Houston first and then other cities around Texas. Daugherty testified that Durkin "was representing Douglas Elliman New York and representing that they were going to be the 51 percent owners of the Texas operation for Douglas Elliman." He testified Sudhoff made the same representation. Daugherty testified that Durkin told him Sudhoff and Lee would "be representing Douglas Elliman New York" and that Sudhoff repeated this representation to JDRE multiple times in Texas, knowing JDRE would not agree to an acquisition by a Sudhoff-led company or startup company. When asked why Durkin was meeting with him in Houston, Daugherty responded, "[DE New York] and [DE Texas] wanted to buy my company to open up their Texas operation." Daugherty testified that he communicated with Sudhoff repeatedly between June 2019 and February 2020 regarding JDRE's acquisition and Sudhoff told him that he was acting on DE New York's behalf.

Durkin confirmed that he traveled to Houston, Texas on June 18, 2019 to meet with Sudhoff, and that he had lunch with Daugherty, Fama, and Sudhoff at the River Oaks Country Club in Houston during his trip. Durkin, however, denied telling Daugherty that DE New York would "be controlling what's going on in Houston or that [DE New York] would own 51% of [REAH]." Durkin also denied overhearing Sudhoff state that DE New York would "control and own 51% of [REAH] or that [DE New York] could fire [REAH] but [REAH] could not fire [DE New York]."

7

On July 2, 2019, DE New York formed DE Texas. DE Texas is a member-managed Texas limited liability company, and DE New York is its sole member. Under the terms of the DE Texas operating agreement, which is governed by Texas law, DE New York has the exclusive power to "hire and appoint officers, agents and/or employees to act on behalf of" DE Texas and all of DE Texas' profits and losses are "allocated 100%" to DE New York. Although DE New York is entitled to all of DE Texas' profits, DE New York "shall not have any liability for the obligations or liabilities of [DE Texas], except to the extent provided in the Code." DE New York contends that DE Texas does not employ, and has never employed, anyone in the State of Texas on behalf of DE New York, and that DE Texas is not licensed as a real estate broker by the State of Texas. According to DE New York, DE Texas maintains books and accounts separate from DE New York, and has its own assets, including an ownership interest in REAH.

On July 17, 2019, DE Texas and Premier signed the Limited Liability Company Agreement for REAH—the joint venture between DE Texas and Premier. ("REAH Agreement").[1] Pursuant to the REAH Agreement, REAH is governed by two managers, one appointed by DE Texas and the other by Premier. The REAH Agreement is between Premier, DE Texas, Sudhoff as Premier's manager, Haber as

---

[1] According to the REAH Agreement, REAH "was formed as a Texas limited liability company pursuant to the filing of its Certificate of Formation (the "Certificate of Formation") with the Secretary of State of the State of Texas on July 10, 2019."

8

DE Texas' manager, and Sudhoff and Lee in their individual capacities. DE Texas acquired a 1% ownership stake in REAH and Premier, Sudhoff's company, acquired the remaining 99 %. Sudhoff is responsible for REAH's day-to-day operations, but he cannot make any "major decisions" for REAH without Haber's prior written consent. The REAH Agreement defines "major decisions" as, among other things, the formation of any subsidiary and "any decisions related to audit, tax or legal matters." Haber signed the REAH Agreement on behalf of DE Texas, by and through DE New York, its managing member, and Sudhoff signed the agreement on behalf of Premier.

On July 17, 2019, Premier and DE Texas executed an Equity Purchase Option Letter Agreement that gave DE Texas the option, exercisable at DE Texas's sole election, to purchase "not less than 25%, but not more than 50%" of Premier's interest in REAH. Sudhoff explained that Lorber and Haber devised that arrangement to retain for DE New York "the right to buy into the company in a larger way."

On July 24, 2019, Lee updated Haber regarding Sudhoff's negotiations with JDRE. According to Lee, one of the next steps in the process was to "circulate the executed NDA to all parties."[2] She also informed Haber that Daugherty and Fama

---

[2] On August 6, 2019, Haber sent a revised non-disclosure agreement to Daugherty. Lee is presumably referring here to the revised August non-disclosure agreement, because the June 2019 NDA was never executed.

would provide them with JDRE's financial statements, which they could use to determine the company's value. Lee stated, "Ken [Haber], we would look for you to take the lead on figuring out what you all think is appropriate."

On August 6, 2019, Haber emailed Daugherty regarding a revised non-disclosure agreement ("Revised NDA"). Fama and Sudhoff were copied on the email. Haber states, "I met with [Sudhoff] this morning and had him sign the mutual NDA between the two of you, which is attached hereto. Please note that we deleted [the non-solicitation agreement Daugherty had proposed] from the NDA, as we had previously discussed. In any event, if in order, please sign and return to [Sudhoff], so that you and he can move forward with your possible transaction." The Revised NDA states, "You have expressed an interest in pursuing a business transaction between John Daugherty Realtors and Real Estate Associates of Texas, LLC d/b/a Douglas Elliman Real Estate or its affiliate." The Revised DNA is signed by Sudhoff on behalf of REAH as REAH's Chief Executive Officer. The Revised NDA refers to the same proposed transaction as the original NDA, but REAH was substituted as the purchaser of JDRE in place of DE New York. REAH, which was formed in July 2019, did not exist when Haber sent the original NDA to JDRE in June 2019.

On August 7, 2019, Sudhoff emailed Daugherty regarding the JDRE acquisition and stated, "As we discussed last[,] Elliman has a formula that is their standard for acquisitions based off the numbers." Haber is copied on the email.

10

Notably, the only Elliman company involved in the transaction with a history of prior acquisitions at that time was DE New York. Daugherty already knew about DE New York's formula because when Haber and Daugherty met in New York in June 2019, Haber told Daugherty that DE New York had a "standard formula they used to purchase companies around the United States."

On August 24, 2019, Sudhoff told Haber that Lee would be meeting with Daugherty later that week and Sudhoff suggested providing Daugherty with an "equation to purchase," which according to Sudhoff, would help them determine whether they "are even in the same ball park of getting a deal done." On August 27, 2019, Lee followed up with Haber, asking for Haber's "thoughts on just a formula proposal and whether that might work."

On September 1, 2019, Sudhoff sent JDRE a draft letter of intent ("Draft LOI") memorializing certain terms related to the acquisition of JDRE, including the purchase price, payout structure, and additional compensation. DE New York's trademark and logo were displayed on every page of the Draft LOI. The proposed signatories were Sudhoff for REAH and Daugherty for JDRE. On November 13, 2019, DE New York hosted an event at the Post Oak Hotel in Houston, Texas.[3] The

---

[3] DE New York does not challenge Griffin Partners' characterization of the event. Rather, DE New York contends that the event is irrelevant because (1) it was held over a month before the letter of intent or asset purchase agreement were signed; (2) it "had nothing to do with Appellee or the Lease;" and (3) "neither the LOI and APA were discussed at the Wealth Report meetings."

11

event was publicized as "Douglas Elliman Celebrates the Arrival of its Global Platform in Texas" and states, "Howard M. Lorber, Scott Durkin, Jacob Sudhoff and Susan de Franca invite you to attend The Wealth Report." According to Haber, DE New York has a relationship with Knight Frank, an international brokerage firm based in London, and Knight Frank produces a report entitled "The Wealth Report," which shows what "rich people like to buy and where rich people like to live." Daugherty and Fama attended the event. When asked what was discussed at the event, Daugherty testified, DE New York was "coming into [] Texas—they were getting into the Texas market." According to Daugherty, he met with DE New York's CEO, Lorber, after the event and Lorber told him "they were excited about getting into the Texas market."

On December 14, 2019, JDRE's representatives and counsel met with Sudhoff and Lee to discuss the principal terms of the JDRE acquisition. According to JDRE's counsel, it "was mentioned" during the meeting that "DE [was] not moving into JDRE's existing space on Post Oak and assuming the existing [Post Oak Lease] obligations."

On December 20, 2019, Lee emailed Daugherty and Fama a letter of intent with respect to the proposed acquisition of JDRE by "Real Estate Associates of Houston, LLC d/b/a Douglas Elliman Texas" ("LOI"). Lee's signature block appears on her email and identifies her as the Chief Operating Officer and in-house

12

counsel for "Douglas Elliman Real Estate Texas." Sudhoff, who had negotiated the terms of the Draft LOI, was copied on the email. The LOI includes more detailed information than the Draft LOI, which Sudhoff had sent to Daugherty on September 1, 2019.

On December 21, 2019, Lee emailed a copy of the LOI to Lorber and Haber. Lee wrote, "We are meeting with [JDRE] today at noon to finalize this agreement but wanted you to also review the terms and let us know if there are any issues." Durkin and Sudhoff were copied on the email. There is no evidence Lorber or Haber reviewed the LOI, responded to Lee's email or objected to the terms of the LOI. Haber stated in his declaration that he had "no recollection of reviewing" the LOI. Durkin also declared that he had never been provided with "any letter of intent" related to the acquisition of JDRE "before the documents were executed by the parties thereto."

On December 21, 2019, Sudhoff learned that the proposed acquisition of JDRE had been leaked to the media. Sudhoff and Steve Larkin ("Larkin"), DE New York's Vice President of Public Relations, were approached by media outlets seeking confirmation of the acquisition and requesting interviews. Sudhoff forwarded a link of one article to Lorber, Durkin, and Susan DeFranca.[4] According

---

[4] Susan DeFranca is the president and chief executive officer of Douglas Elliman Development Marketing.

to Sudhoff, there had been a "group of agents that wanted to leave" JDRE before the leak and Sudhoff believed that "the reason for the leak was to be able to help retain [those] agents." Sudhoff explained that "telling [these agents] that Elliman" was buying JDRE "was buying time to get [them] to stay on board."

Larkin summoned the public relations and marketing personnel from DE New York, DE Texas, and REAH to manage the publicity surrounding the acquisition. One of the people involved, John Robbins ("Robbins") from "Douglas Elliman Real Estate–Texas,"[5] forwarded a proposed press release, designated as "Internal Only," to Sudhoff, Lee, and Larkin. The press release was entitled, "Douglas Elliman Continues Statewide Expansion in Texas, Third Largest Real Estate Brokerage in the United States to acquire Houston-Based John Daugherty Realtors." The press release also states that "Douglas Elliman, the nation's second largest residential real estate brokerage company, announced today that it has entered into a letter of intent to acquire John Daugherty Realtors." Lee forwarded the press release to Haber, and Haber in turn emailed Larkin expressing concerns about the assertion in the press release that DE New York was purchasing JDRE. According to Haber, the press release needed to be revised to reflect that "DE Texas" was the entity acquiring JDRE. Robbins also emailed a list of talking points about the JDRE acquisition to Sudhoff and Lee. Larkin was copied on the email.

---

[5]      This information is from Robbins' email signature block.

On December 22, 2019, JDRE's counsel sent Daugherty and Fama his preliminary comments regarding the LOI "prepared by DE" for the acquisition of JDRE, which Daugherty forwarded to Sudhoff the next day, on December 23, 2019. Summarizing the LOI's terms, JDRE's counsel noted that, among other things, "DE Realty" would not be assuming JDRE's Post Oak Lease and JDRE would move its personnel to DE's offices on Kirby Drive in Houston, Texas.[6]

On December 23, 2019, DE New York or REAH hosted what Haber describes as a "launch event" at the Post Oak Hotel in Houston, Texas attended by Haber, Durkin, Larkin, Sudhoff, Daugherty, Fama, and JDRE's agents.[7] According to Daugherty, Durkin announced in front of him and the other 100 or so meeting attendants that DE New York was purchasing JDRE. Haber testified that "Daugherty announced [JDRE's] deal with [REAH] to JDRE's agents and others in attendance, and I gave a short speech to the crowd concerning [DE New York's] growth and capabilities." When asked if it was "announced at that meeting that Elliman New York had acquired John Daugherty Real Estate," Sudhoff stated that "it was discussed that there was an arrangement made between the two parties."

Sudhoff explained that "the goal was to try to retain agents that were wanting to leave [JDRE] at the time" and "one of the ways that we thought that was good to

---

[6] The LOI defines REAH as "DE."

[7] Haber testified that REAH hosted the event. Daugherty testified that DE New York paid for the event.

15

retain these agents after we just made this announcement [about the acquisition] was to be able to bring [Durkin] into town so that . . . they could learn more and get to see somebody . . . from Elliman New York and [have Durkin] answer questions that we just couldn't even answer about the resources . . . and you know, training and everything that the agents really wanted." The anticipated acquisition, however, also concerned some of JDRE's agents and after the launch event at the Post Oak Hotel, Mark Menendez, President of DE Texas, reported to Sudhoff, Lee, Durkin, Larkin, and others that "most of the [JDRE] agents that had apprehension to the new structure [had] turned a positive corner after the event." According to Sudhoff, only five of JDRE's 125 agents left the company.

On the same day as the launch event, Sudhoff and Daugherty executed the LOI. According to Daugherty, the LOI was executed after the event at the Post Oak Hotel. The LOI is on Douglas Elliman Real Estate's letterhead, which reflects that the company was "Est. 1911," and includes Douglas Elliman Texas' name and address at the top under the letterhead. Sudhoff signed the LOI on behalf of "Douglas Elliman Texas" and Daugherty signed on behalf of JDRE.

Subsection (e) of the LOI required JDRE to use its best efforts to terminate the Post Oak Lease and relocate its agents to 2001 Kirby Drive, in Houston, Texas where REAH's offices were located. When asked if he ever discussed Subsection (e) of the LOI with Haber, Sudhoff testified that he had not discussed the terms of

the LOI with Haber and he did not know if Haber had any concerns about Section (e). When asked if he ever discussed the Post Oak Lease with Haber, Sudhoff testified, "It was not really about the lease itself just was about, you know, is you know, is the plan to stay at that location or if it is—the plan is to relocate them to 2001 Kirby and we had said the plan was always to relocate to 2001 Kirby." Sudhoff testified that it was DE New York's standard practice to not assume a lease and REAH did not assume the Post Oak Lease based on advice from counsel and DE New York. Sudhoff further testified he had neither seen the Post Oak Lease nor was he aware of its terms.[8]

Sudhoff testified that his associate Lee had been communicating with Haber about the LOI. When asked if she had kept Haber "fully apprised of the letter of intent," Lee responded that she was sure she and Haber had talked about it but she did not know "specifically at what point in time we discussed it."

On December 23, 2019, Haber emailed Lee a "a form of a draft asset purchase agreement" that he had received from Jacob Herzek ("Herzek"), another of DE New York's vice presidents. In his email, Haber noted, "You may not need everything, but it[']s a good starting point." According to Haber, Lee had requested a "form agreement for the acquisition of the company." A few days later, Herzek sent Lee

---

[8]     Sudhoff considered JDRE's obligation to use its best efforts to terminate the Post Oak Lease to be a "nonissue" because Daugherty "had always said to us that he would easily be able to take care of it because of his relationship with the Griffins."

17

additional documents to accompany the asset purchase agreement, including a legal checklist and bill of sale.

On January 9, 2020, JDRE and REAH executed an Asset Purchase Agreement for the acquisition of JDRE ("APA"). Under the APA, REAH did not assume the Post Oak Lease and JDRE was required to use its best efforts to terminate the Post Oak Lease and relocate its employees and agents to 2001 Kirby, Houston, Texas. On January 11, 2020, Griffin Partners' representatives, Fred and Edward Griffin, met Daugherty, Fama, JDRE's counsel, Sudhoff, and Lee. Sudhoff allegedly informed Griffin Partners at that time that JDRE had been acquired by DE New York or REAH, the buyer would not be assuming the Post Oak Lease, JDRE was terminating or repudiating the Post Oak Lease, and JDRE would be moving its staff and personnel out of its Post Oak offices. One month later in February 2020, REAH terminated the APA, after having allegedly acquired most of JDRE's agents and JDRE filed for bankruptcy a few days later.

**Procedural Background**

On January 17, 2020, Griffin Partners sued DE Texas, Sudhoff Companies, and Sudhoff for tortious interference with the Post Oak Lease and conspiracy. On

18

August 1, 2020, Griffin Partners filed its First Amended Petition naming DE Texas, Sudhoff Companies, Premier, Sudhoff, REAH, and DE New York as defendants.[9]

On November 11, 2020, Griffin Partners filed its Second Amended Petition naming DE Texas, Sudhoff Companies, Sudhoff, REAH, DE New York, and Premier as defendants. Griffin Partners asserted claims against the named defendants for tortious interference with contract and conspiracy. It also sought a declaratory judgment that "DE Texas was used to perpetrate tortious interference with the [Post Oak] Lease to benefit its owner DE New York such that its corporate form should be disregarded and liability imposed upon DE New York for any final judgment entered in this action against DE Texas," and "[REAH] was used to perpetrate tortious interference with the [Post Oak] Lease to benefit its owners DE New York and Premier such that its corporate form should be disregarded and liability imposed upon DE New York and Premier, jointly and severally, for any final judgment entered in this action against [REAH]."

Griffin Partners alleged that the named defendants, including DE New York, had "tortiously interfered and conspired to tortiously interfere with the [Post Oak] Lease by requiring JDRE to repudiate the Lease as a condition of Defendants' acquisition of JDRE." Griffin Partners also alleged that DE Texas and REAH were

_____

[9] Although Griffin Partners initially asserted claims against JDRE for repudiation and breach of contract in its original petition, Griffin Partners did not name JDRE as a defendant in its amended petition.

19

DE New York's alter egos and DE Texas, REAH, Sudhoff, Sudhoff Companies, and Premier were DE New York's agents.[10]

DE New York filed a Special Appearance and an original answer, and the parties conducted jurisdictional discovery. The trial court held a hearing on DE New York's special appearance and issued its ruling denying the special appearance on January 26, 2021. The trial court did not issue findings of fact and conclusions of law. This interlocutory appeal followed.[11]

### Personal Jurisdiction

DE New York challenges the trial court's denial of its special appearance, contending the trial court lacks general and specific jurisdiction over it, and challenging the trial court's implied findings that it is subject to personal jurisdiction in Texas based on the theories of alter ego and agency. DE New York argues the trial court does not have general jurisdiction over it because DE New York is not headquartered in Texas, does not do business in Texas, and is not otherwise "at home" in Texas. DE New York further contends that the trial court lacks specific jurisdiction over it because DE New York has not purposefully availed itself of the benefits of conducting business in Texas and it has no connection to the allegations

---

[10] Griffin Partners' agency and alter ego theories were presumably included to support its jurisdictional claims with respect to DE New York.

[11] *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(7) (permitting interlocutory appeal from denial of special appearance).

20

in Griffin Partners' lawsuit because it was not involved in the drafting and negotiation of the LOI or APA. DE New York also contends there is legally and factually insufficient evidence supporting the trial court's implied findings that DE Texas or REAH are DE New York's alter egos or that Sudhoff or Lee were DE New York's agents thus permitting those parties' contacts to be imputed to DE New York for purposes of establishing personal jurisdiction.

## Applicable Law

### A.    Personal Jurisdiction

A court may assert personal jurisdiction over a nonresident defendant only if the Texas long-arm statute and due process requirements of the Fourteenth Amendment to the United States Constitution are satisfied. *See* U.S. CONST. amend. XIV, § 1; TEX. CIV. PRAC. & REM. CODE § 17.042; *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C*., 815 S.W.2d 223, 226–27 (Tex. 1991). The Texas long-arm statute allows Texas courts to exercise personal jurisdiction over a nonresident defendant who is doing "business in this state" and "commits a tort in whole or in part in this state." TEX. CIV. PRAC. & REM. CODE § 17.042(2). The reach of the long-arm statute extends to the full extent permitted by the Due Process Clause of the Fourteenth Amendment. *M & F Worldwide Corp. v. Pepsi-Cola Metro. Bottling Co., Inc.*, 512 S.W.3d 878, 885 (Tex. 2017). Due process is satisfied when the nonresident defendant has established minimum contacts with the forum state

21

and the exercise of jurisdiction over the nonresident defendant comports with traditional notions of fair play and substantial justice. *See id.*; *see also Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).[12] A nonresident defendant's minimum contacts with a forum are established when the defendant "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *M & F Worldwide Corp.*, 512 S.W.3d at 886; *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024–25 (2021); *see also TV Azteca v. Ruiz*, 490 S.W.3d 29, 37 (Tex. 2016).

The Texas Supreme Court has characterized the "purposeful availment" requisite as the "touchstone of jurisdictional due process." *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex. 2005). There are three important aspects of the purposeful-availment inquiry. *Id*. at 785. First, only the defendant's contacts with the forum state count. *Id*. This ensures that a defendant is not haled into a jurisdiction solely by the unilateral activities of a third party. *Id*. Second, the acts relied on must be purposeful; a defendant may not be haled into a jurisdiction

---

[12] DE Realty does not argue that the exercise of personal jurisdiction over DE Realty in Texas violates traditional notions of fair play and substantial justice. We thus limit our inquiry to whether DE Realty has sufficient minimum contacts with Texas. *See Madison Dev. Group LLC v. Mattress Firm, Inc.*, 608 S.W.3d 376, 400 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (affirming denial of special appearances after finding sufficient minimum contacts for specific jurisdiction and stating specially appearing defendants "have not demonstrated or argued that exercising jurisdiction would offend traditional notions of fair play and substantial justice").

solely based on contacts that are "random, isolated, or fortuitous." *Id.* Third, a defendant "must seek some benefit, advantage, or profit by 'availing' itself of the jurisdiction." *Id.* By "invoking the benefits and protections of a forum's laws, a nonresident consents to suit there." *Id.*

A defendant's contacts with a forum state can give rise to either general or specific jurisdiction. *Ford Motor Co.*, 141 S. Ct. at 1024. Specific jurisdiction exists when the claims involved in the litigation relate to or arise from the nonresident defendant's contacts with the forum state. *Id.*; *see also M & F Worldwide Corp.*, 512 S.W.3d at 885. The defendant's contacts with the forum state (1) must be purposeful, and (2) the cause of action must "arise from or relate to" those contacts. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 579–80 (Tex. 2007). "There must be a substantial connection between th[e forum] contacts and the operative facts of the litigation." *Id.* at 585.

General jurisdiction "involves a court's ability to exercise jurisdiction over a nonresident defendant based on any claim, including claims unrelated to the defendant's contacts with the state." *M & F Worldwide Corp.*, 512 S.W.3d at 885 (quotation omitted); *see also Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 137 S. Ct. 1773, 1780 (2017). ("A court with general jurisdiction may hear any claim against that defendant, even if all the incidents underlying the claim occurred in a different State."). For general jurisdiction to exist, the defendant's contacts with the

forum state must be continuous and systematic. *See Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014); *see also M & F Worldwide Corp.*, 512 S.W.3d at 885. Although there is not a precise formulation for the point at which "jurisdictional contacts reach a tipping point," the general-jurisdiction inquiry is "very different from a specific jurisdiction inquiry" and involves a "more demanding minimum contacts analysis," with a "substantially higher threshold." *PHC-Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 167–68 (Tex. 2007) (quotations omitted).

With respect to a corporation, the "paradigm" forums for the exercise of general jurisdiction are the place of incorporation and principal place of business. *Ford Motor Co.*, 141 S. Ct. at 1024; *see also Daimler AG*, 571 U.S. at 137. "Those affiliations have the virtue of being unique—that is, each ordinarily indicates only one place—as well as easily ascertainable." *Daimler AG*, 571 U.S. at 137. Such bases afford a plaintiff "recourse to at least one clear and certain forum in which a corporate defendant may be sued on any and all claims." *Id.* "[C]ourt[s] may assert general jurisdiction over foreign . . . corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Id.* at 127 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)); *see also Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 565 (Tex. 2018) ("Even when a defendant's contacts may be continuous and systematic, they are insufficient to

confer general jurisdiction if they fail to rise to the level of rendering a defendant 'essentially at home in the forum [s]tate.'"). Whether a corporate defendant is "at home" in the forum state requires "an appraisal of [its] activities in their entirety, nationwide and worldwide." *Daimler AG*, 571 U.S. at 139 n.20. "A corporation that operates in many places can scarcely be deemed at home in all of them." *Id.* To determine whether a nonresident defendant has continuous and systematic contacts with Texas sufficient to support general jurisdiction, the court examines the defendant's contacts and forum-related activities up to the time suit was filed. *See PHC–Minden*, 235 S.W.3d at 170.

A trial court determines a special appearance "on the basis of the pleadings, any stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony." TEX. R. CIV. P. 120a(3); *see Touradji v. Beach Cap. P'ship, L.P.*, 316 S.W.3d 15, 23 (Tex. App.—Houston [1st Dist.] 2010, no pet.) ("The plaintiff's original pleadings as well as its response to the defendant's special appearance can be considered in determining whether the plaintiff satisfied its burden."). When a case involves multiple defendants, their contacts cannot be aggregated. *See Loya v. Taylor*, No. 01-14-01014-CV, 2016 WL 6962312, at *3 (Tex. App.—Houston [1st Dist.] Nov. 29, 2016, pet. denied) (mem. op.). Rather, the plaintiff must specify, and the court must examine, each defendant's actions and contacts with the forum. *Id.*

25

The plaintiff and the defendant bear shifting burdens of proof in a challenge to personal jurisdiction. *See Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 149–150 (Tex. 2013); *Kelly v. Gen. Interior Constr.*, 301 S.W.3d 653, 658–59 (Tex. 2010). The plaintiff bears the initial burden of pleading allegations sufficient to bring a nonresident defendant within the provisions of the Texas long-arm statute. *Moncrief Oil Int'l Inc.*, 414 S.W.3d at 149. If the plaintiff meets its initial burden, the burden shifts to the nonresident defendant to negate the plaintiff's alleged bases for jurisdiction. *Id*. The defendant can negate jurisdiction either by disproving the plaintiff's allegations or by showing that the evidence is legally insufficient to establish jurisdiction, taking the plaintiff's allegations as true. *Kelly*, 301 S.W.3d at 659.

## B.   Standard of Review

Whether a trial court has personal jurisdiction over a nonresident defendant is a question of law we review de novo. *Old Republic Nat'l Title Ins.*, 549 S.W.3d at 558 (citing *Moncrief Oil Int'l Inc.*, 414 S.W.3d at 150). The trial court must frequently resolve fact questions before deciding the jurisdictional question. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). The trial court is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Predator Downhole Inc. v. Flotek Indus., Inc.*, 504 S.W.3d 394, 402 (Tex. App.—Houston [1st Dist.] 2016, no pet.). We will not disturb a trial court's

26

resolution of conflicting evidence that turns on such credibility or weight. *Id.* When, as here, the trial court does not issue findings of fact and conclusions of law, all fact findings necessary to support the judgment and supported by evidence are implied. *Old Republic Nat'l Title Ins.*, 549 S.W.3d at 558 (citing *BMC Software*, 83 S.W.3d at 795).

If the defendant challenges the sufficiency of the evidence supporting an implied finding, we review such findings using the standard sufficiency analysis applicable to civil cases. *See BMC Software*, 83 S.W.3d at 794; *see also Ennis v. Loiseau*, 164 S.W.3d 698, 706 (Tex. App.—Austin 2005, no pet.) (stating courts consider entire record and conduct "ordinary sufficiency review" when determining whether evidence is sufficient to support trial court's fact findings for purposes of special appearance). We will affirm the trial court's ruling on any legal theory that finds support in the record. *Guam Indus. Servs., Inc. v. Dresser-Rand Co.*, 514 S.W.3d 828, 832 (Tex. App.—Houston [1st Dist.] 2017, no pet.); *see also Predator Downhole Inc.*, 504 S.W.3d at 402.

The test for legal sufficiency is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). When conducting a legal sufficiency review, we view the evidence in the light favorable to the verdict, credit favorable evidence if a reasonable factfinder could, and disregard any contrary evidence unless

27

a reasonable factfinder could not. *Id.* at 807. So long as the evidence falls within the zone of reasonable disagreement, we may not substitute our judgment for that of the factfinder. *Id.* at 822. A legal-sufficiency challenge will be sustained if the record reveals that evidence offered to prove a vital fact is no more than a scintilla or the evidence conclusively establishes the opposite of a vital fact. *Id.* at 810. Evidence does not exceed a scintilla if it is so weak as to do no more than create a mere surmise or suspicion that the fact exists. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).

In a factual-sufficiency challenge, we consider and weigh all the evidence, both supporting and contradicting the finding. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998). We may set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id.* at 407. We may not substitute our own judgment for that of the fact finder or pass upon the credibility of witnesses. *Id.* (stating "the court of appeals may not pass upon the witnesses' credibility or substitute its judgment for that of the jury, even if the evidence would clearly support a different result").

Once we determine that the trial court's findings are supported by sufficient evidence, or if the material facts are undisputed, we review the trial court's ruling on a special appearance de novo. *Baker Hughes Inc. v. Brooks*, 405 S.W.3d 246, 249 (Tex. App.—Houston [14th Dist.] 2013, pet. denied).

28

## Specific Jurisdiction

Griffin Partners argues that DE Realty is subject to specific jurisdiction in Texas because (1) DE New York "deliberately targeted and exploited" the Texas residential real estate market, (2) "DE Texas and DE Houston were the tools through which [DE New York] executed its plan to extract profit from real estate activity in Texas, [and DE New York] is responsible, in a jurisdictional sense, for DE Texas' and DE Houston's activity," (3) DE Texas' and DE Houston's contacts with Texas are attributable to DE New York because those companies are DE New York's alter ego, and (4) Sudhoff, DE Texas, and DE Houston are DE New York's agents and thus, their contacts with Texas are attributable to DE Realty.[13]

Because the issue is dispositive, we first consider Griffin Partners' specific jurisdiction arguments based on agency principles.

### A. Agency

An agent is one who is authorized to transact business or manage some affair for a person or entity. *Townsend v. Univ. Hosp.*, 83 S.W.3d 913, 921 (Tex. App.—Texarkana 2002, pet. denied). A principal is liable for the acts of another acting as its agent only when the agent has actual or apparent authority to do those acts. *See Gaines v. Kelly*, 235 S.W.3d 179, 182 (Tex. 2007). Actual authority is dependent

---

[13] Griffin Partners also asserts that DE New York is subject to general jurisdiction in Texas. Because we resolve the issue based on specific jurisdiction, we need not address the general jurisdiction argument.

29

upon the existence of some communication by the principal to the agent. *See id.*; *see also Greenfield Energy, Inc. v. Duprey*, 252 S.W.3d 721, 734 (Tex. App.—Houston [14th Dist.] 2011, no pet.) ("Actual authority is created through written or spoken words or conduct of the principal communicated to the agent.") (citation omitted). Apparent authority, on the other hand, arises "either from a principal knowingly permitting an agent to hold [himself] out as having authority or by a principal's actions that lack such ordinary care as to clothe an agent with the indicia of authority, thus leading a reasonably prudent person to believe that the agent has the authority [he] purports to exercise." *Id.* (quoting *Baptist Mem. Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 948 (Tex. 1998)). "[A]pparent authority must be based on the acts of the principal" and "is limited to the scope of responsibility that is apparently authorized." *Gaines*, 235 S.W.3d at 184 (quoting *First Valley Bank of Los Fresnos v. Martin*, 144 S.W.3d 466, 471 (Tex. 2004)). Mere declarations of an alleged agent, standing alone, are "incompetent to establish either the existence of the alleged agency or the scope of the alleged agent's authority." *Gaines*, 235 S.W.3d at 183–84. "Because apparent authority is an estoppel principle, a party seeking to recover under such legal theory must show justifiable reliance on the principal's words or conduct resulting in harm to the party." *See Reliant Energy Servs, Inc. v. Cotton Valley Compression, L.L.C.*, 336 S.W.3d 764, 784 (Tex. App.—Houston [1st Dist.] 2011, no pet.). The standard courts employ when evaluating the

reasonableness of a third party's assumptions about apparent authority "is that of a reasonably prudent person, using diligence and discretion to ascertain the agent's authority." *See Gaines*, 235 S.W.3d at 182–83 (citing *Chastain v. Cooper & Reed*, 257 S.W.2d 422, 427 (Tex. 1953)); *see also Reliant Energy Servs., Inc.*, 336 S.W.3d at 787 ("'[R]easonable diligence to ascertain [an] agent's authority' is part of the standard under Texas law for determining whether a person is 'reasonably prudent' in the context of apparent authority. . .") (quoting *Gaines*, 235 S.W.3d at 182–83).

Authority to act on the principal's behalf and control are the two essential elements of agency. *See Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 589 (Tex. 2017). "[T]he key question is whether the principal has the right to control the agent with respect to the details of that conduct." *State Farm Mut. Auto Ins. Co. v. Traver*, 980 S.W.2d 625, 627 (Tex. 1998). A "principal's right of control presupposes that the principal retains the capacity throughout the relationship to assess the agent's performance, provide instructions to the agent, and terminate the agency relationship by revoking the agent's authority." *See Exxon Mobil Corp.*, 520 S.W.3d at 590; *see also Coleman v. Klockner & Co. AG*, 180 S.W.3d 577, 588 (Tex. App.—Houston [14th Dist.] 2005, no pet.) ("The critical element of an agency relationship is the right to control, and the principal must have control of both the means and details of the process by which the agent is to accomplish his task in order for an agency relationship to exist."). Agency is not presumed and a party alleging the existence

31

of an agency relationship bears the burden of proving it. *See Exxon Mobil Corp.*, 520 S.W.3d at 589.

Griffin Partners argues that Sudhoff's contacts with Texas can be imputed to DE New York for jurisdictional purposes because Sudhoff was acting as an agent of DE New York when the parties negotiated and executed the LOI and APA for JDRE's acquisition. DE New York responds that Griffin Partners failed to establish agency for jurisdictional purposes based on Sudhoff's contacts because (1) Sudhoff's declarations are insufficient to establish the existence of an agency or the scope of Sudhoff's authority; (2) DE New York "denied that it ever cloaked Sudhoff, Lee or REAH to act as its agent or on its behalf"' and; (3) none of DE New York's conduct "would lead a reasonably prudent person using diligence and discretion to suppose the agent had authority to act on behalf of the principal."

Griffin Partners argues that Sudhoff was DE New York's agent for purposes of the JDRE acquisition, including the drafting and negotiating of the LOI and APA, because several of DE New York's officers and Sudhoff represented to Daugherty that DE New York was moving into the Texas market and DE New York would be the majority owner of the Texas operations with control over Sudhoff. Griffin Partners also points to other evidence of agency, such as Sudhoff's signature on the Revised NDA on what Griffin Partners describes as DE New York's letterhead, and DE New York listing Sudhoff and Lee on DE New York's website as the newest

32

members of DE New York's national sales management team, allowing Sudhoff, Lee, and REAH to use "Douglas Elliman" signs, and providing Sudhoff and Lee with @elliman.com email addresses. Griffin Partners further contends that DE New York "held Sudhoff out as its agent by naming him as one of the [DE New York] representatives hosting and conducting the Wealth Report" event in Houston, Texas.

Daugherty testified that Sudhoff told him he was a representative of DE New York. According to Daugherty, Sudhoff told him "Douglas Elliman New York is coming into Texas to get in the residential real estate business, and they will be owning 51 percent of [the] Douglas Elliman Texas operation." Sudhoff also told Daugherty that "New York can fire me, but I can't fire them." Daugherty further testified that Haber and Durkin told him that DE New York was getting into the Texas market and would be the majority owner of the Texas enterprise. Daugherty claims Sudhoff made these same representations to JDRE in Haber's and Durkin's presence and that Haber and Durkin did not deny or refute Sudhoff's statements. According to Daugherty, Haber told him that DE New York "had complete control of what was going to happen in Texas" and Haber "was in charge of Texas."

While Sudhoff's declarations standing alone do not establish an agency relationship or the scope of any alleged agency, Griffin Partners also relies on Haber's and Durkin's alleged declarations and their silence when Sudhoff purposefully made his declarations of authority in their presence. *See Gaines*, 235

S.W.3d at 183–84 (stating agent's declarations, standing alone, are "incompetent to establish either the existence of the alleged agency or the scope of the alleged agent's authority"). DE New York suggests that Haber's and Durkin's alleged statements and failures to correct Sudhoff's statements do not constitute evidence of an agency relationship because Haber and Durkin denied making or overhearing any such statements.

In his declaration, Haber stated "Sudhoff is not employed by and has no position or role at either DE [New York] or Douglas Elliman of Texas, LLC [DE Texas]." Haber denied ever telling Daugherty or anyone associated with JDRE that, among other things: (1) "Sudhoff was representing DE [New York];" (2) DE New York "was, is or will be the majority owner, 51% owner, or the owner" of REAH; (3) DE New York could fire REAH, but REAH could not fire DE New York, or; (4) DE New York "is or will be in charge or in control of" REAH and "what happens in Houston or Texas." Haber also denied overhearing anyone, including Sudhoff, make such statements to Daugherty or JDRE. Haber also denied ever hearing Sudhoff or anyone else "make such statements to Daugherty or anyone associated with JDRE." In his declaration, Durkin, like Haber, denied making or overhearing anyone make such representations to Daugherty or JDRE. Durkin also denied telling Daugherty or anyone else at lunch in June 2019, that DE New York "will be controlling what's going on in Houston or that [DE New York] would own 51% of Real Estate

34

Associates of Houston, LLC [REAH]" or overhearing "Sudhoff state that [DE New York] is going to control and own 51% of [REAH], or that [DE New York] could fire [REAH] but [REAH] could not fire [DE New York]."

While Haber's and Durkin's testimony refutes Daugherty's testimony regarding the existence of an agency relationship between Sudhoff and DE New York or the scope of such agency, their testimony does not render Daugherty's testimony insufficient to establish an agency relationship. In a special appearance, the trial court is the sole judge of the witnesses' credibility and the weight to be given their testimony. *See Guam Indus. Servs., Inc.*, 514 S.W.3d at 832. Thus, it was the trial court's province to evaluate the witnesses' credibility on this issue and the weight to be given their testimony. We will not "disturb [the] trial court's resolution of conflicting evidence that turns on the credibility or weight of the evidence." *Id.* (quoting *Ennis*, 164 S.W.3d at 706).

The record also reflects that Sudhoff and Lee kept Haber—and Lorber to a lesser extent—informed of any developments with respect to the JDRE acquisition at all stages of the transaction. Before it was finalized, Lee sent copies of the LOI to Lorber, Haber, and Durkin and asked them to "review the terms and let us know if there are any issues." The pricing information in the LOI was based on DE New York's "standard formula." There was also evidence Haber had the ability to negotiate the terms of the LOI himself, but he declined to do so and instead instructed

35

Sudhoff and REAH to negotiate the terms of the acquisition with JDRE. Haber also testified that he had Sudhoff sign the Revised NDA between REAH and JDRE. Thus, in addition to Daugherty's testimony regarding statements made by Haber, Durkin, and Sudhoff regarding agency, this is some evidence of the control DE New York exercised over Sudhoff concerning the drafting and negotiating of the LOI and the APA. *See Exxon Mobil Corp.*, 520 S.W.3d at 590 (stating "principal's right of control presupposes that the principal retains the capacity throughout the relationship to assess the agent's performance, provide instructions to the agent, and terminate the agency relationship by revoking the agent's authority"); *State Farm Mut. Auto Ins. Co.*, 980 S.W.2d at 627 ("[T]he key question is whether the principal has the right to control the agent with respect to the details of that conduct.").

Griffin Partners also argues that DE New York clothed Sudhoff and Lee with the indicia of authority in 2019 by (1) listing Sudhoff and Lee on www.elliman.com, DE New York's website, as the newest members of DE New York's national sales management team; (2) allowing Sudhoff, Lee, and REAH to put a "Douglas Elliman" sign outside their Houston, Texas office; and (3) providing Sudhoff and Lee with @elliman.com email addresses, which Sudhoff and Lee used to communicate with Daugherty and Fama regarding JDRE's acquisition.[14] DE New

_____

[14]    Griffin Partners asserts that Lee, Sudhoff's associate, and REAH are also agents of DE New York.

36

York argues that Sudhoff's, Lee's, and REAH's use of the @elliman.com email domain and the Douglas Elliman signs, and the contents of the elliman.com website are insufficient to create an agency relationship. While these circumstances, standing alone, may be insufficient to establish apparent authority, this evidence is nonetheless relevant to assess the reasonableness of Daugherty's assumption that an agency relationship existed between DE New York and Sudhoff. *See Gaines*, 235 S.W.3d at 183 (stating that when assessing existence of agent's apparent authority, courts examine principal's conduct and reasonableness of third party's assumptions about authority).

DE New York argues that Daugherty and JDRE could not have reasonably relied on any statements Sudhoff allegedly made about DE New York's involvement in Texas before the APA was signed, because Daugherty admitted that JDRE "did not perform due diligence regarding who was in control or involved in REAH." According to DE New York, any representations Sudhoff allegedly made to Daugherty regarding DE New York's "involvement could not have reasonably induced Daugherty to sign the APA or LOI, as [the LOI and APA] clearly contradicted any such statements, and it was Daugherty's responsibility to evaluate the truth of their veracity when the APA and LOI did not reflect them." The question before us, however, is whether Daugherty used "reasonable diligence to ascertain [Sudhoff's] authority," not whether Daugherty exercised due diligence to ascertain

37

whether DE New York was the majority owner of REAH. *See Reliant Energy Servs., Inc.*, 336 S.W.3d at 787 ("'[R]easonable diligence to ascertain [an] agent's authority' is part of the standard under Texas law for determining whether a person is 'reasonably prudent' in the context of apparent authority. . .") (quoting *Gaines*, 235 S.W.3d at 182–83). Furthermore, Daugherty did not expressly testify that he did not perform any due diligence. Rather, Daugherty testified that he did not ask for proof of DE Texas' ownership or investigate whether "Elliman Texas even existed" when Haber allegedly told Daugherty that he would be "the one that was in charge of Texas." Daugherty's testimony merely demonstrates that he did not inquire about DE Texas—the corporate entity DE New York intended to use to exercise its purported control over its Texas operations. This does not establish that Daugherty did not use reasonable diligence to determine whether Sudhoff was DE New York's agent.

DE New York also argues Daugherty's reliance on Sudhoff's statements was not reasonable because "Daugherty never said that Sudhoff held himself out to be an agent of [DE New York], and [Daugherty] admitted he knew [DE New York] was not a party to the APA or LOI." Although Sudhoff did not use the term "agent" to describe his relationship with DE New York, as previously discussed, Daugherty testified Sudhoff represented to him that DE New York exercised such control over the Texas operations, including the JDRE acquisition, and that DE New York could

fire Sudhoff and Lee, but Sudhoff and Lee could not fire DE New York. A principal's right to control the agent is an essential element of agency. *See Exxon Mobil Corp.*, 520 S.W.3d at 590 (stating "principal's right of control presupposes that the principal retains the capacity throughout the relationship to assess the agent's performance, provide instructions to the agent, and terminate the agency relationship by revoking the agent's authority").

When asked if he knew that DE New York had not signed the LOI, Daugherty testified he was told "in New York that Sudhoff was representing Elliman New York." Daugherty explained that he "never knew Elliman New York was not involved in" JDRE's acquisition and he testified he "would have never signed that [LOI] if I wasn't under the clear understanding that Elliman New York wasn't the controlled owner." Had DE New York been a signatory to the LOI or APA, this would have been some evidence that Sudhoff was acting on DE New York's behalf when he negotiated the LOI and APA, but the absence of this fact does not mean that Daugherty's reliance on Sudhoff's statements was unreasonable because DE New York could still have exercised the requisite control over Sudhoff's activities. *See id.*

Moreover, Griffin Partners does not argue that Sudhoff was DE New York's agent for purposes of the JDRE acquisition because DE New York was a party to the JDRE transaction. Rather, Griffin Partners argues that Sudhoff was acting as DE

39

New York's agent with respect to the JDRE acquisition because this transaction was part of DE New York's overarching plan to enter the Texas residential real estate market using its subsidiaries and affiliates and DE New York's financial interest in the transaction. The LOI and APA both require JDRE to use its best efforts to terminate the Post Oak Lease. According to Griffin Partners, DE New York tortiously interfered with the Post Oak Lease by requiring JDRE to terminate the lease in the LOI and APA. Whether or not DE New York was a signatory to the LOI or APA, the evidence reflects that DE New York not only had a financial stake in the Texas enterprise, it was also the puppet master pulling the strings behind the acquisition.

The record also reflects that DE New York took an active and visible role in acquiring JDRE both leading up to and after the signing of the LOI and prior to the signing of the APA. According to Daugherty, it was during the early meetings in New York and in Houston, Texas in June 2019 that Lorber, Durkin, Haber, and Sudhoff represented to Daugherty that DE New York was getting involved in the Texas real estate market and Sudhoff would be acting on its behalf, and DE New York would be in "complete control" of the business endeavor, such that DE New York could fire Sudhoff, but Sudhoff could not fire DE New York.

While any of these factors standing alone may be insufficient to establish the existence and scope of an agency relationship, we hold that DE New York's actions

as a whole would lead a reasonably prudent person to believe that Sudhoff was authorized to act as DE New York's agent for purposes of the JDRE acquisition, including the drafting and negotiation of the LOI and APA. This is more than a scintilla of evidence supporting the trial court's implied finding that Sudhoff was authorized to act as DE New York's agent. *See City of Keller*, 168 S.W.3d at 810 (stating legal-sufficiency challenge will be sustained if evidence offered to prove vital fact is no more than mere scintilla).

Although there is conflicting evidence over whether Sudhoff had authority to act on DE New York's behalf, it was the trial court's prerogative to evaluate the credibility of the witnesses and assess the amount of weight to give such evidence and we must defer to those findings. *See Guam Indus. Servs., Inc.*, 514 S.W.3d at 832 (stating trial court is sole judge of witnesses' credibility and weight to be given testimony for purposes of special appearance); *see also City of Keller*, 168 S.W.3d at 822 (stating court must not substitute its judgment for that of factfinder so long as evidence falls within zone of reasonable disagreement). Considering all the evidence before us, we cannot say that the evidence supporting the trial court's implied finding that an agency relationship existed between Sudhoff and DE New York is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Mar. Overseas Corp.*, 971 S.W.2d at 407.

We conclude there is legally and factually sufficient evidence supporting the trial court's implied finding that Sudhoff was authorized to act as DE New York's agent for purposes of the JDRE acquisition.[15]

## B.    Sudhoff's Contact with Texas

Having determined there is legally and factually sufficient evidence supporting the trial court's implied finding that Sudhoff was authorized to act as DE New York's agent for purposes of the JDRE acquisition, we now consider whether Sudhoff's contacts with Texas are sufficient to confer personal jurisdiction over DE New York in Texas.[16] *See generally Baker Hughes Inc.*, 405 S.W.3d at 249 (stating

---

[15]    DE New York also argues that Griffin Partners cannot rely on the affidavits of Fred and Edward Griffin to establish an agency relationship between Sudhoff and DE New York because the affidavits contain "legal conclusions and factual deficiencies regarding interpretation of the LOI and APA and Sudhoff and Lee's legal capacity to act on behalf of" DE New York.  *See* TEX. R. CIV. P. 120a(3) (stating when deciding special appearance, court may consider affidavits submitted by party if affidavits "set forth specific facts as would be admissible in evidence"); *see also Ennis v. Loiseau*, 164 S.W.3d 698, 703–04 (Tex. App.—Austin 2005, no pet.). We need not decide that issue because even without the affidavits of Fred and Edward Griffins, there is sufficient evidence supporting the trial court's implied agency finding.

[16]    We understand Griffin Partners to argue that, as DE New York's agent, Sudhoff's contacts are attributable to DE New York for purposes of both general and specific jurisdiction.

Although Sudhoff is a Texas resident and the court unquestionably has personal general jurisdiction over him individually, this fact alone does not subject DE New York to general jurisdiction in Texas.  *See Daimler AG v. Bauman*, 571 U.S. 117, 136 (2014) ("Even if we were to assume that [Daimler's subsidiary] MBUSA is at home in California, and further to assume MBUSA's contacts are imputable to Daimler, there would still be no basis to subject Daimler to general jurisdiction in California, for *Daimler's slim contacts with the State hardly render it at home there*.") (emphasis added).  Furthermore, while agency relationships "may be

42

appellate courts review trial court's ruling on special appearance de novo when trial court's findings are supported by sufficient evidence).  Relevant here, an agent's contacts with a forum state may be imputed to its nonresident principal for purposes of establishing personal jurisdiction.  *See Greenfield Energy, Inc.*, 252 S.W.3d at 733; *see also Stocksy United v. Morris*, 592 S.W.3d 538, 547 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (stating agent's contacts may serve as basis for exercise of personal jurisdiction over foreign principal).  Thus, for purposes of our specific-jurisdictional analysis, we impute Sudhoff's contacts with Texas to DE New York. *See Greenfield Energy, Inc.*, 252 S.W.3d at 733; *see also Stocksy United*, 592 S.W.3d at 547.

Specific jurisdiction exists when the plaintiff's cause of action arises from or relates to the nonresident defendant's contacts with the forum state.  *See Ford Motor Co.*, 141 S. Ct. at 1025; *see also Moki Mac*, 221 S.W.3d at 576 (stating specific

relevant to the existence of *specific* jurisdiction[,]" because "a corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there[,] . . . [i]t does not inevitably follow . . . that similar reasoning applies to general jurisdiction." *Id.* at 135 n.13.  The *Daimler* court expressly declined to address whether an agency relationship is also relevant for purposes of establishing general jurisdiction.  *Id.* at 134–35 ("This Court has not yet addressed whether a foreign corporation may be subjected to a court's general jurisdiction based on the contacts of its in-state subsidiary. . . . But we need not pass judgment on invocation of an agency theory in the context of general jurisdiction, for in no event can the appeals court's analysis be sustained.").  In any event, we need not decide the issue of general jurisdiction because we find that DE New York is subject to specific jurisdiction in Texas.

jurisdiction is established if nonresident defendant's alleged liability arises out of or is related to its activity within forum). A nonresident defendant's minimum contacts with a forum are established for purposes of specific jurisdiction when the defendant "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *M & F Worldwide Corp.*, 512 S.W.3d at 886 (quoting *Moncrief Oil Int'l Inc.*, 414 S.W.3d at 150).

To determine whether a defendant has purposefully availed itself of the benefits of conducting activities within the forum state, thus involving the benefit and protection of its law, we consider (1) "only the defendant's contacts with the forum" state; (2) the defendant's "purposeful" acts, as opposed to "random, isolated, or fortuitous" events; and (3) whether the defendant sought "some benefit, advantage, or profit by 'availing' itself of the jurisdiction" such that it impliedly consents to suit there. *M & F Worldwide Corp.*, 512 S.W.3d at 886 (quoting *Michiana Easy Livin' Country, Inc.*, 168 S.W.3d at 785). The defendant's contacts must show "that the defendant deliberately 'reached out beyond its home—by, for example, exploi[ting] a market in the forum State or entering a contractual relationship centered there." *Ford Motor Co.*, 141 S. Ct. at 1025 (quoting *Walden v. Fiore*, 571 U.S. 277, 285 (2014) (internal quotation omitted)).

For purposes of specific jurisdiction, purposeful availment "has no jurisdictional relevance unless the defendant's liability arises from or relates to the

forum contacts." *TV Azteca*, 490 S.W.3d at 52 (quoting *Moki Mac*, 221 S.W.3d at 579). A claim arises from or relates to a defendant's forum contacts if there is a "substantial connection between those contacts and the operative facts of the litigation." *TV Azteca*, 490 S.W.3d at 52 (quoting *Moki Mac*, 221 S.W.3d at 585); *see also Walden*, 134 S. Ct. at 1121 ("For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State."). The "substantial connection" standard is mainly concerned with whether the defendant's contacts will be "the focus of the trial," "consume most if not all of the litigation's attention," and are "related to the operative facts" of the underlying claim. *See TV Azteca*, 490 S.W.3d at 52–53 (quoting *Moki Mac*, 221 S.W.3d at 585)).

Sudhoff negotiated the LOI and APA with JDRE, a real estate brokerage firm with its headquarters and principal place of business in Houston, Texas, and JDRE's owner, Daugherty, a Texas resident. Except for the June 2019 trip to New York, most of Sudhoff's meetings with JDRE regarding the JDRE acquisition occurred in Texas and the JDRE acquisition concerned real estate transactions in Texas. The LOI and the APA were negotiated by Sudhoff in Texas and contain the operative contractual language at issue in this case requiring JDRE to "use its best efforts to terminate the [Post Oak] Lease" and relocate its agents and employees to REAH's

45

offices on Kirby Drive in Houston, Texas. This contractual obligation to "terminate" the Post Oak Lease is at the heart of Griffin Partners' tortious-interference claim.

In its second amended petition, Griffin Partners specifically alleges that DE New York, DE Texas, REAH, Sudhoff, Sudhoff Companies, and Premier "tortiously interfered and conspired to tortiously interfere with the [Post Oak] Lease by requiring JDRE to repudiate the [Post Oak] Lease as a condition of Defendants' acquisition of JDRE." Thus, there is a substantial connection between Sudhoff's contacts in Texas concerning the LOI and APA and the operative facts of Griffin Partners' suit for tortious interference. *See TV Azteca*, 490 S.W.3d at 52–53 (stating "substantial connection" standard mainly concerns whether contacts will be "the focus of the trial" and "consume most if not all of the litigation's attention," and whether contacts are "related to the operative facts" of the claim) (quoting *Moki Mac*, 221 S.W.3d at 585); *Moki Mac*, 221 S.W.3d at 575 (stating for cause of action to "arise from or relate to" purposeful forum contacts, "there must be a substantial connection between those contacts and the operative facts of the litigation"); *see generally Ford Motor Co.*, 141 S. Ct. at 1026 (clarifying requirement that suit "relate to" defendant's contacts with forum "contemplates that some relationships will support jurisdiction without a causal showing").

Based on the evidence before us, we conclude that Sudhoff's contacts with the forum state are sufficient to confer specific jurisdiction over DE New York in

Texas.  *See Stocksy United*, 592 S.W.3d at 547 (stating agent's contacts may serve as basis for exercise of personal jurisdiction over foreign principal).  Because we hold the trial court has specific personal jurisdiction over DE New York, we need not address whether general jurisdiction is present.

## Conclusion

We lift the stay previously imposed in this cause, and we affirm the trial court's denial of DE New York's special appearance.


Veronica Rivas-Molloy
Justice


Panel consists of Justices Landau, Hightower, and Rivas-Molloy.